## In re IMPERIAL IRR. DIST.

### No. 24664–M.

District Court, S. D. California, Central Division.

May 2, 1935.

834

Harry W. Horton and George R. Kirk, both of El Centro, Cal., for petitioner, Imperial Irr. Dist.

Orrick, Palmer & Dahlquist (by R. W. Palmer), of San Francisco, Cal., for Bondholders' Protective Committee.

Clark, Nichols & Eltse (by George Clark), of Berkeley, Cal., for Mary E. Morris, objecting creditor.

Hickcox & Trude, of El Centro, Cal., and Henry W. Coil and D. L. King, both of Riverside, Cal., for Southern Sierras Power Co. and others, objecting creditors.

W. Coburn Cook, of Turlock, Cal., for George F. Covell, objecting creditor.

A. Heber Winder, of Riverside, Cal., for James H. Jordan and others, objecting creditors.

Donley Bolinger, of Los Angeles, Cal., for Orange Building & Loan Ass'n and First Nat. Bank of Orange, objecting creditors.

Hugh K. McKevitt, of San Francisco, Cal., for Pacific Mut. Nat. Bank of San Francisco, objecting creditor.

McCORMICK, District Judge.

To avail itself of the remedial provisions of the National Bankruptcy Act as amended by adding section 80 of chapter 9 thereof, approved May 24, 1934 (11 USCA § 303), Imperial Irrigation District, a public agency and taxing district within Imperial County, state of California, pursuant to a duly adopted resolution of its board of directors, and on September 10, 1934, filed in this court a verified petition for readjustment of its debts.

It is alleged therein that Imperial Irrigation District, hereinafter called the "District," is unable to meet its debts as they mature, and that a plan designed and intended to affect creditors owning or holding bonds or registered warrants of the District has been prepared and has been consented to and accepted in writing by 87.31 per cent. in amount of such creditors, excluding in said computation any such obligations owned or controlled by the District.

There is filed as the petition, and by reference allegations made a part of it, the following exhibits:

(a) Plan for refunding bond and registered warrant indebtedness of the District dated December 29, 1932, together with resolution of the board of directors of the District dated December 16, 1932, adopting said plan.

(b) Warrant retirement plan pursuant to resolution of the board of directors of the District dated June 8, 1934, to co-operate with bond refunding plan disclosed by Exhibit (a) of the petition.

(c) Agreement of bondholders of the District, dated December 29, 1932, accepting the plan disclosed by Exhibit (a), and for deposit of their bonds in specified depositaries to consummate the plan of refunding bonded and unpaid registered warrant indebtedness of the District.

(d) Form of letter of consent by bondholders accepting the plan disclosed by Exhibit (a), and signed by each bondholder listed in the petition and in parts of Exhibit (g) of the petition.

(e) Form of letter of transmittal executed and sent by each bondholder who has accepted the plan disclosed by Exhibit (a) to the depositaries designated by the plan.

(f) Form of letter of transmittal to specific depositaries and consent of each owner and holder of registered warrants of the District, ratifying and consenting to warrant retirement plan disclosed in Exhibits (a) and (b) of the petition.

(g) Schedules of names and addresses of all bondholders of the District and amounts of indebtedness to each, as well as a list of all bondholders who have accepted the plan of debt readjustment stated through the petition, with the form of written acceptance executed by each bondholder appended thereto, as well as a list of all bondholders who have not consented to said plan, together with their addresses and respective amounts of indebtedness; each of said classifications of bondholders of the District being separately listed. These schedules show that owners of over $12,275,000 of the total outstanding bonds aggregating $14,250,000 have accepted, consented to, and agreed to the plan disclosed in the petition and Exhibit (a) thereof.

(h) Lists of all registered warrant holders of the District, together with their residences and the amount of indebtedness to each, with the form of written consent to the plan of debt readjustment and warrant retirement plan that was signed by each appended thereto, together with an itemization of those registered warrant holders who have and those who have not agreed to accept the plan set forth in the petition; each of said classifications of warrant holders of the District being separately listed. These lists show that owners of $757,797.73 of the total registered warrants aggregating $884,713.89 have accepted, consented to, and agreed to the plan disclosed in the petition and Exhibits (a) and (b) thereof.

(i) Lists of names and addresses, so far as known to the District, and amounts due the respectively named creditors of the District whose claims represent executory contracts and contracts for future rent and judgment claims, none of which, it is alleged in the petition, are involved in or affected by the plan of readjustment.

(j) Certified copy of minutes of a meeting of the bondholders' protective committee of the District on July 13, 1934, ratifying the plan and the warrant retirement provisions of it disclosed by Exhibits (a), (b), and (c) of the petition, and instructing counsel for said committee, in collaboration with the attorney for the District, to prepare a petition, pursuant to the National Bankruptcy Act, to effectuate the said entire refunding plan by proceedings in the United States District Court; copy of resolution dated September 8, 1934, of a bondholders' protective committee that was constituted by creditors of the District under the plan of debt readjustment dated December 29, 1932, Exhibit (a) of the petition, authorizing the prosecution to confirmation in the United States District Court of the petition for debt readjustment of the District according to the plan that had been prepared and was about to be filed herein; consent in writing of such duly constituted committee of the holders of bonds owning at least 30 per cent. in amount of the bonds of the District affected by the plan of readjustment to the said plan of debt readjustment as contained in Exhibits (a) and (b) of the petition.

(k) Copy of findings and judgment of the Superior Court of the State of California, County of Imperial, made and entered pursuant to applicable laws of the state of California. These findings and judgment recite that all steps re-

quired by the laws of the state for the issuance of refunding bonds have been duly taken, including an election wherein the electors of the District by a vote of 4,955 favorable and 689 opposed approved said refunding bond issue. The court validates the refunding issue of bonds of the District aggregating $14,250,000 in amount, which bonds and the plan relating thereto as shown by Exhibit (a) of the petition, together with the registered warrant retirement plan, Exhibit (b), and the agreement, Exhibit (c) of the petition, constitute the sole debt readjustment plan involved in this proceeding.

(*l*) 1. Attested copy of an order of the California District Securities Commission, being Order No. 65 thereof, dated December 16, 1932, finding that the District is justified in proceeding with the proposed refunding bond issue aggregating $14,250,000, to be used for the purpose of refunding the first, second, third, and fourth bond issues of the District aggregating said amount, in accordance with the resolution of the board of directors of the District adopted December 16, 1932. 2. Attested copy of an order of the California District Securities Commission, being Order No. 66 thereof, dated June 8, 1934, approving unpaid registered warrants proposals in the refunding debt plan of the District in conjunction with the bond features of the plan approved by Order No. 65 of said Securities Commission.

(m) Attested copy of resolution of board of directors of the District, adopted September 7, 1934, approving and accepting the plan shown by Exhibits (a), (b), and (c) of the petition and authorizing filing of petition for debt readjustment pursuant to aforesaid plan and under chapter 9 of the Act of Congress approved May 24, 1934 [11 USCA §§ 301–303], and instructing counsel for the District to file same in this court.

Upon the filing of the petition, Judge James of this court, to whom it was presented, by an order dated September 10, 1934, approved it as properly filed, fixed November 16, 1934, at San Diego, Cal., as the day and place of hearing the petition, and directed that notice of the filing and hearing of said petition be given by publication in a newspaper of general circulation published within the District and also by mailing a copy of such notice to each creditor listed in the petition and in its exhibits, and upon the same day Judge James issued an order to show cause to certain creditors of the District which had theretofore instituted certain proceedings in the California Supreme Court against the District. This order has been rendered ineffective by the voluntary dismissal by said creditors of said state court proceedings, and is immaterial to the consideration of the matters now before this court.

On November 16, 1934, upon proof by affidavit of compliance with the order requiring notice, the petition was called for hearing, when it appeared that the time for appearances by creditors of the District, pursuant to the notice, had not expired. All further hearings of the petition were regularly continued to December 20, 1934. Upon December 19, 1934, and after a creditor of the District, by petition, had made application therefor, Judge Hollzer of this court transferred the proceeding from the Southern to the Central Division of this court, and continued the hearing of all matters herein to January 31, 1935, at Los Angeles, Cal., and under the rules of assignment of the business of the court, the entire proceeding came before me. At this hearing evidence was offered by the petitioner that established the allegations of the petition. The objectors cross-examined the witnesses, and were given opportunity to rebut the showing made by the petitioner. The objectors offered no testimony, and all parties submitted this entire matter for decision.

Prior to the last-mentioned date, and in due time under section 80, approximately fifty bondholders, owning an aggregate of $650,000 of bonds of the District, and one registered warrant holder holding demands in the amount of $11,609.62, appeared to contest the petition and filed interventions, motions to dismiss, and answers to the petition of the District. The total amount of indebtedness represented by all the objectors to the petition and the plan is less than 5 per cent. of the outstanding bonds and registered warrants of the District.

Subdivision (a) of section 80, supra (11 USCA § 303 (a), contains the following provision: "If creditors holding 5 per centum in amount of the bonds, notes, or certificates of indebtedness shall, within ninety days after the first publication of the notice provided for in subdivision (c), clause (1), of this chapter, appear and con-

trovert the facts alleged in the petition, the judge shall decide the issues presented, and unless the material allegations of the petition are sustained, shall dismiss the petition."

Inasmuch as less than the required 5 per centum in amount of the creditors of the District appeared or controverted the allegations of the petition, it is doubtful whether the objectors can raise any question as to the sufficiency of the facts pleaded in the petition. Nevertheless, because the objectors are creditors of the District who are affected by the plan submitted in and by the petition, they undoubtedly cannot be barred from presenting to the court contests to the confirmation of the plan; and inasmuch as the last sentence in subdivision (c) of said section 80, 11 USCA § 303 (c) reads, "Any creditor shall be heard on the question of the proposed confirmation of the plan, and, upon filing a petition for leave to intervene, on such other questions arising in the proceeding as the judge shall determine," it is now held that the objecting creditors are entitled to question the factual sufficiency of the petition. In order to ascertain whether or not the jurisdictional prerequisites have been pleaded in the petition, every exhibit that is by reference made part of the petition must be considered. In re East Contra Costa Irrigation District (D. C. N. D. Cal.) 10 F. Supp. 175.

The contentions of all opposing creditors are similar and will be considered jointly, unless otherwise noted in this memorandum.

It is primarily claimed that the petition of the District is insufficient, in that it fails to contain a "list of all known creditors of the taxing district, together with their addresses so far as known to the taxing district, and description of their respective claims showing separately those who have accepted the plan of readjustment, together with their separate addresses." Subdivision (a), section 80, Act of May 24, 1934, 11 USCA § 303 (a). I understand the claim to be that the petition to be sufficient under this section must list every known creditor of the District, regardless of whether or not he is affected by the debt readjustment plan that is submitted for approval by the court. This position is untenable. The Act of May 24, 1934, is an omnibus legislative method of debt readjustment, to relieve impoverished and financially depleted taxing districts of a state from their unmeetable obligations, either generally or in part.

Subdivision (b) section 80 of the act (11 USCA § 303 (b), as far as it is pertinent to the present inquiry, reads:

"A plan of readjustment within the meaning of this chapter (1) shall include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through the issuance of new securities of any character or otherwise; and (2) may contain such other provisions and agreements, not inconsistent with this chapter, as the parties may desire.

"No creditor shall be deemed to be affected by any plan of readjustment unless the same shall affect his interests materially and adversely, and in case any controversy shall arise as to whether any creditor or class thereof shall or shall not be affected, the issue shall be determined by the judge after hearing upon notice to the parties interested."

And while the definition of "creditors" in the same subdivision of the act, "shall include for all purposes of this chapter all holders of claims, debts, securities, liens or other interests of whatever character against the taxing district or its property or revenues, including claims under executory contracts and for future rent, whether or not such claims would otherwise constitute provable claims under this title, and all holders of judgments rendered against such taxing district, excepting claims for salaries and wages of officers and employees of the taxing district," it is clear, when the broad scope of debt readjustment contemplated and sanctioned by the statute is considered, that it is unnecessary that creditors who are not affected by a plan of debt readjustment must be named in the petition. In other words, an irrigation district may place all claims and creditors in its plan of readjustment, or it may limit its readjustment plan to a class of creditors. The latter method is sought by the District in this proceeding, and in such cases only creditors who are affected by the proposed plan need be named in the petition. This conclusion is fortified by considering the extent of the confirmatory power lodged in the court by the concluding proviso in subsection (d), 11 USCA § 303 (d) as follows: "That it shall not be requisite to the confirmation of the plan that there be such acceptance by any credi-

838

tor or class of creditors (a) whose claims are not affected by the plan," etc.

To construe section 80 so as to require, in every proceeding thereunder for any readjustment of a taxing district debt, that all creditors of the district should be listed, would not only compel an idle act, which the law never requires to be done, but would also tend to defeat one of the chief purposes of the statute, which is, as stated in subdivision (b) thereof, to authorize provisions modifying or altering the right of any class of creditors of the district.

It may be that under the terms of the act a creditor who is materially and adversely affected by the plan, and who had not been listed in the petition, could be heard to object to the petition and to the plan submitted therein. No such situation exists in this proceeding, as all bondholders, warrant holders, and other creditors affected by the plan have been scheduled, and the objectors are among such creditors who are listed in the petition. These objectors can in no sense be regarded as representatives of a class of creditors who are neither bondholders nor warrant holders, but other creditors of the District who are affected by the plan of debt readjustment set forth in the petition.

■ It is asserted that the petition is jurisdictionally deficient because the required percentage of creditors in amount authorized by section 80 to submit the plan of debt readjustment to the court is made up of bond and warrant owners who have accepted the plan that is submitted for confirmation, and therefore they are not owners of evidences of indebtedness of the taxing district who are affected by the plan.

This argument is unique, but in my opinion fallacious. If it were applied it might well lead to a situation where one dissenting bond owner of a district, having an infinitesimal money interest in aggregate outstanding bonds, could require the dismissal of a petition under section 80 in which all other bond owners have agreed upon the readjustment of a bonded indebtedness, merely because the plan of debt readjustment had been, prior to tendering the petition for filing, accepted by all but the one dissenter. It seems to me the statement of the proposition is a refutation of it. Such an interpretation would defeat the whole congressional scheme for the readjustment of taxing district debts. It would render the statute impotent as far as

any remedial qualities are concerned. Moreover, in this matter the fact that the over 87 per cent. of the creditors affected by the plan of debt readjustment had, prior to directing the petition to be filed in this court, accepted the plan set out by the petition, by no means irrevocably commits them to the plan set out by the petition, even if the court should confirm it.

■ The assenting bond owners act through a committee composed of bond owners and constituted in the plan itself, and in the agreement dated December 29, 1932, which is an inextricable part of the plan. In the agreement many express and specific provisions appear that give the assenting bond owner, through his committee, plenary powers in modifying or declaring ineffective the plan, or abandoning it or substituting other methods of debt readjustment than that contained in the plan. It is to be presumed that the bondholders' committee will act in good faith and for the best interests of all bondholders.

■ Section 8 of article IV of the agreement is illustrative. It reads: "The Committee, at any time prior to carrying out the Plan or any modified or substituted plan or readjustment or liquidation of the indebtedness of said District, may abandon the Plan or such modified or substituted plan if in its discretion it may be deemed advisable so to do, notwithstanding that the same has been declared or has become operative."

It is obvious that the assenting bondholders are as affected by the plan as the dissenters, and both elements should be evaluated in deciding whether or not the required percentage in amount to file the petition has been obtained.

■ The argument is advanced that the petition is fatally defective in failing to show that the California Districts Securities Commission, a state agency invested with supervisorial and control powers over irrigation districts within the state, has approved it. Subdivision (k) of section 80, 11 USCA § 303 (k) reads: "Nothing contained in this chapter shall be construed to limit or impair the power of any State to control, by legislation or otherwise, any political subdivision thereof in the exercise of its political or governmental powers, including expenditures therefor, and including the power to require the approval by any governmental agency of the State of the filing of any petition hereunder and of

any plan of readjustment, and whenever there shall exist or shall hereafter be created under the law of any State any agency of such State authorized to exercise supervision or control over the fiscal affairs of all or any political subdivisions thereof, and whenever such agency has assumed such supervision or control over any political subdivision, then no petition of such political subdivision may be received hereunder unless accompanied by the written approval of such agency, and no plan of readjustment shall be put into temporary effect or finally confirmed without the written approval of such agency of such plans."

Attention has been directed earlier in this memorandum to Exhibit (*l*) of the petition, wherein by orders of the said Securities Commission approval was given to the bond and warrant refunding plan of the District that is shown by the petition filed herein. These approvals, however, were tentative and conditional, and of themselves do not meet the requirements of said subdivision (k).

The attorney for the District claims that notwithstanding this deficiency, because it is shown by uncontradicted testimony introduced at the hearing before this court on January 31 that said commission never assumed or attempted to assume supervision or control over the fiscal affairs of the District, the consent of said agency is unnecessary. I think this position of the District is devoid of merit.

The right of the State Securities Commission to control the fiscal affairs of the District automatically arose upon default to the extent of at least 20 per cent. of the amount due upon its bond obligations, under section 11, chapter 60, p. 355, Statutes and Amendments of Codes of California 1933. Such defaults have successively occurred annually beginning in the year 1932. The control under the California state statute that thus arises continues until the defaults have been cured by full payment of all amounts due.

Nevertheless, there is a subsequent statute of California that validates the petition under consideration. This later expression of the State Legislature—the same authority that created the Securities Commission and endowed it with authority over the fiscal affairs of the District—in September, 1934, a few days after the filing of the petition herein, enacted section 7a of chapter 4, p. 5, Extra Session of 1934, which reads:

"Sec. 7a. Whenever any taxing district has heretofore filed or purported or attempted to file a petition under Chapter IX of the Federal Bankruptcy Statute or has taken or attempted to take any other proceedings under Chapter IX of the Federal Bankruptcy Statute, all acts and proceedings of such taxing district and of the governing board or body and of public officers of such taxing district in connection with such petition or proceedings, are hereby legalized, ratified, confirmed and declared valid to all intents and purposes and the power of such taxing district to file such petition and take such other proceedings is hereby ratified, confirmed and declared, but all such proceedings taken after the date this act takes effect shall be taken in accordance with and pursuant to this act."

This law clearly manifests the approval by all governmental agencies of the state of the filing of petition herein, as well as the plan of readjustment that is set forth in the petition, and completely provides the state consent that is required in section 80, to give this court jurisdiction of this proceeding.

I employ the apt language of Judge St. Sure of the Northern District of California, who considered the identical question under discussion in Re East Contra Costa Irrigation District (D. C.) 10 F. Supp. 175, 177, decided by him March 13, 1935: "In the light of the section just quoted, and the knowledge that all matters here under consideration deal with laws, both of the United States and of the state of California, which are remedial (made so because of the emergency element which was the compelling influence in their enactment), the contention that this court is without jurisdiction because the petition lacks the 'consent allegation' must fail. Where petitions of the character here involved were filed prior to September 20, 1934, as was the petition herein, the validating statute by its terms made unnecessary the obtaining the consent of the commission."

In concluding consideration of the sufficiency of the allegations of the petition herein to give this court jurisdiction of this proceeding, assuming the validity of section 80 of the National Bankruptcy Act (11 USCA § 303), and considering all exhibits of the petition, it is ordered that all objectors' motions to dismiss the petition are severally denied.

■ The constitutionality of section 80, as added to the National Bankruptcy Act on May 24, 1934, is challenged by the objectors. I think the statute is valid as far as any of its terms concern this proceeding.

The grant of federal power in bankruptcy matters is found in article 1, § 8, of the Constitution, which provides, "The Congress shall have Power * *. * [4] To establish * * * uniform Laws on the subject of Bankruptcies throughout the United States," and in the coefficient investiture of national authority in clause 18 of the same section and article of the organic law of the nation, which reads: "The Congress shall have Power (18) To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers." The verbiage of these basic delegations of power to the national legislature by the people of the United States is broad and inclusive. Everything and every one that Congress may have the will to place within "bankruptcies" and which are not manifestly without the "subject of bankruptcies" as developed by changing economic conditions and interpreted by the Supreme Court is valid legislation under these applicable clauses of the Constitution. The only limitations are those prescribed in the Constitution itself. Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23. I find nothing therein that renders section 80 void as this act applies to the Imperial Irrigation District or to this proceeding by it.

■ The Supreme Court, without dissent, in recent cases involving section 77 of the Bankruptcy Act (11 USCA § 205), relating to the reorganization of railroads, sustained the constitutionality of legislation that is not unlike the statute under consideration in this proceeding. Continental Illinois Bank & Trust Co. v. Chicago, Rock Island & Pacific Railway Co., 55. S. Ct. 595, 604, 79 L. Ed. ——, decided April 1, 1935. Both sections are emergency measures enacted as aids to national economic recovery. Both are remedial statutes and accordingly must be broadly interpreted to accomplish their purposes.

Justice Sutherland, in the learned and exhaustive opinion of the court, in the Rock Island Railway Case, reviewed the history of bankruptcies both in England and in the United States. He pointed out the difference between "bankruptcy" in the two countries, and also traced the valid evolution and judicially sanctioned extension of "the subject of bankruptcies" within the meaning of the Constitution, and in that connection said: "The fundamental and radically progressive nature of these extensions becomes apparent upon their mere statement; but all have been judicially approved or accepted as falling within the power conferred by the bankruptcy clause of the Constitution. Taken altogether, they demonstrate in a very striking way the capacity of the bankruptcy clause to meet new conditions as they have been disclosed as a result of the tremendous growth of business and development of human activities from 1800 to the present day. And these acts, far-reaching though they be, have not gone beyond the limit of congressional power; but rather have constituted extensions into a field whose boundaries may not yet be fully revealed."

There is good reason to believe that the municipal debt readjustment provisions of the Act of May 24, 1934, are well within the area of the field of constitutional enactments adverted to by the learned justice.

■ The evidence submitted at the hearing on January 31 clearly showed that the District is unable to meet its debts as they mature, that default has existed as to its outstanding bond and registered warrant obligations since July 1, 1932, and that this unmeetable financial situation has been mounting year by year since that time. The dislocations of market conditions for farm products, the excess of credit allowances on farm lands, and the depreciation of acreage values, coupled with the most disastrous water shortage in the Imperial Valley, demonstrate beyond any doubt that the District is "bankrupt" within the meaning of the Constitution.

Under the Rock Island Railway Case, supra, a quasi-public corporate body that was "unable to meet its debts as they mature" was held to be properly subject to Congressional legislation within the bankruptcy clauses of the Constitution. The District involved in this proceeding is also a public body, and because it is also a governmental unit of the state of California it is not without the constitutional pale of Congressional authority on the "subject of bankruptcy throughout the United States," as far as any of its functions that are sought to be affected by section 80 in this proceeding is concerned.

In the early case of Cohens v. Virginia, 6 Wheat. 264, 413, 414, 5 L. Ed. 257, the Supreme Court, in discussing power that is granted by the language of the Constitution in national matters, speaking through Chief Justice Marshall, said: "That the United States form, for many, and for most important purposes, a single nation, has not yet been denied. In war, we are one people. In making peace, we are one people. In all commercial regulations, we are one and the same people. In many other respects, the American people are one; and the government which is alone capable of controlling and managing their interests in all these respects, is the government of the Union. It is their government, and in that character, they have no other. America has chosen to be, in many respects, and to many purposes, a nation; and for all these purposes, her government is complete; to all these objects, it is competent. The people have declared, that in the exercise of all powers given for these objects, it is supreme. It can, then, in effecting these objects, legitimately control all individuals or governments within the American territory. The constitution and laws of a state, so far as they are repugnant to the constitution and laws of the United States, are absolutely void. These states are constituent parts of the United States; they are members of one great empire—for some purposes sovereign, for some purposes subordinate."

■ There is nothing in the municipal debt readjustment act that usurps unsurrendered state sovereignty. The dual aspects of national and local governmental authority are expressly safeguarded and conserved. The private or proprietary element of an irrigation district is sufficiently distinct and definite to bring it within the purview of the bankruptcy power of Congress. This is especially true where the state, as the creator and dominant power of the district's governmental functions, has given its consent. Compare Meriwether v. Garrett, 102 U. S. 472, 26 L. Ed. 197.

The quotations from subsection (k) earlier in this memorandum clearly show that only fiscal matters of state taxing districts are subject to the act, and that as to those, if there be any state agency that controls or supervises them, then before any petition can be received under the act, it must be accompanied by the written approval of such agency, and

moreover that, "No plan of readjustment shall be put into temporary effect or finally confirmed without the written approval of such agency of such plans." 11 USCA § 303 (k).

Attention has already been directed to the permissive statute of California that expresses the plenary consent of the state to the filing of this proceeding by the District. This factual difference distinguishes the decision of the Federal District Court in Texas in Re Cameron County Water Improvement District No. 1, 9 F. Supp. 103, from the proceeding here.

■ The California statute, supra, does not impair the obligation of contracts. It is solely an enabling act that authorizes political subdivisions of the state to take advantage of the National Bankruptcy Act. The maximum relief administered by the state is a partial waiver of its immunity against federal action affecting its own governmental action. The impairment of contracts is brought about by the national law, and not by the state measure, and local consent similar in effect to that sanctioned by the California statute of September 20, 1934, has been held to be valid. See Clark v. Barnard, 108 U. S. 436, 2 S. Ct. 878, 27 L. Ed. 780; Gunter v. Atlantic Coast Line R. Co., 200 U. S. 273, 26 S. Ct. 252, 50 L. Ed. 477.

It is unreasonable, in the light of the broad terms of the constitutional grants of power on the "subjects of bankruptcy," to believe that a state irrigation district that is "unable to meet its debts as they mature" is powerless to revamp its fiscal makeup in order that it may continue to function. In the Imperial Irrigation District compliance with valid applicable state laws alone is fruitless because it is elementary that no such law can impair the obligations of a contract, and it is imperative that existing contractual rights of bond owners be altered by law in order to readjust the financial affairs of this District in a workable manner. There can be no doubt of the validity of a national law that has that required effect. Hanover National Bank v. Moyses, 186 U. S. 181, 22 S. Ct. 857, 46 L. Ed. 1113; Rock Island Reorganization Case, supra.

■ Congress may pass laws pertinent to any of the powers conferred by the Constitution that operate incidentally to impair or destroy the obligation of pri-

vate contracts. The relation between the District, the landowners therein, and the bond owners thereof, is private, within the meaning of the law. Legal Tender Cases, 12 Wall. 457, 548, 20 L. Ed. 287; Rock Island Railway Reorganization Case, supra.

In the Northern District of California, section 80 of the National Bankruptcy Act as added May 24, 1934 (11 USCA § 303), was held to be constitutional, as applied to the readjustment of debts of an irrigation district existing under the laws of the state of California. See In re East Contra Costa Irrigation District, supra. I agree with such conclusion.

The final contention of the objectors is that the court should not confirm the plan set forth in the petition and established by the evidence at the hearing on January 31, 1935, because it is not fair and because it discriminates unfairly in favor of bond owners of certain issues.

The District, since its organization, pursuant to applicable laws of California, and exclusive of the refunding plan bond issue of $14,250,000, has duly made four separate issues of its serial bonds, aggregating $16,000,000, as follows:

*First bond issue,* dated January 1, 1915, in principal amount of $3,500,000, with interest at the rate of 5 per cent. per annum, payable semiannually on the 1st days of January and July; the maturity of these bonds being from twenty to forty years after date of issue.

*Second bond issue,* dated July 1, 1917, in amount of $2,500,000, with interest payable semiannually on the 1st days of January and July, at 5 per cent. per annum; maturities being twenty to forty years from date of issue.

*Third bond issue,* dated October 1, 1919, in amount of $2,500,000, with interest payable semiannually on the 1st days of January and July, at 5½ per cent. per annum; the maturities being from July 1, 1925, periodically to and including July 1, 1934. This issue had been reduced by retirement to the amount of $750,000, with interest.

*Fourth bond issue,* dated July 1, 1922, in amount of $7,500,000, with interest payable semiannually on January 1 and July 1, at 6 per cent. per annum; the maturities of these bonds being from July 1, 1935, periodically to and including July 1, 1956.

The plan of debt readjustment provides that upon deposit of outstanding bonds they will be exchanged respectively for the refunding bonds, par for par; section 6 of the plan reading: "All of the bonds of the First Division of said First Refunding Issue shall be exchangeable for the outstanding bonds of the District for its First Issue dated January 1, 1915, and also of its Second Issue dated July 1, 1917. All of the refunding bonds of said Second Division of said First Refunding Issue shall be exchangeable for outstanding bonds of the Third Issue of the District dated October 1, 1919, and all of the bonds of said Third Division of said First Refunding Issue shall be exchangeable for the outstanding bonds of the Fourth Issue of the District dated July 1, 1922. Such exchanges shall be made upon a basis of par for par. In the event January 1, 1933, coupons, or any subsequently maturing coupons, are not attached to any of the outstanding bonds when so exchanged, appropriate deduction shall be made from the coupons appertaining to the refunding bonds exchangeable therefor so that in each case such exchange shall be made upon a basis of par for par. Such exchanges may be made at any time or from time to time while any of said outstanding bonds of the First, Second, Third or Fourth Issue of the District may be presented to the District for such exchange. No such exchange shall be made until this Board of Directors shall first by resolution determine that this refunding plan shall be consummated."

It is considered unnecessary to analyze the plan in detail. Substantially it provides that there shall be no bond principal reduction of any issue, but that the maturities of each issue shall be extended: As to bonds of the first, second, and fourth issues, to January 1, 1983, and as to the unretired bonds of the third issue, $350,000 thereof on July 1, 1939, and $400,000 on July 1, 1942.

The interest upon bonds is not to be permanently reduced, but temporary relief to the District will be afforded by reducing rates of interest upon all bonds during the years 1933 to 1936, inclusive. This reduction of interest is to cease in 1936, when all subsequent interest payments will conform to the rate of each original issue respectively.

The principal of all registered warrants remains unchanged by the plan, but the interest thereon is to be reduced by the same percentages and over the same period as the bond interest. The warrants are to be retired pro rata with the retirement of the bonds of the third issue that have maturity dates in 1933 and 1934.

Beginning in 1938, the plan provides that the District shall establish a sinking fund, according to a definite schedule specifically set forth in the plan, in an amount sufficient to retire all refunding bonds by maturity.

The only substantial objection to the plan, in my opinion, is that urged by some of the owners of bonds of the first and second issues, that the plan unjustly discriminates against them by depriving them of prior lien rights which they enjoy under the laws of the state of California.

The evidence shows that of the $3,500,000 of the issue of January 1, 1915, the owners of $3,066,500, or 87.3 per cent. of the total, have consented to the plan and deposited their bonds to accomplish it, and that of the second bond issue of July 1, 1917, the owners of $2,100,000 of the $2,500,000, or 84 per cent. of the total, have likewise consented to the plan and deposited their bonds to effectuate it.

At the hearing of this matter, the testimony further showed that prior to the promulgation of the plan, and in December of 1932, bonds of the District were selling at approximately 20 per cent. of their face values, but that since the plan was submitted to the bond owners and warrant owners, and as the refunding program has progressed, the market values of the bonds of the District have increased, and in January, 1935, the price of 5 per cent. bonds was 50 to 51 cents on each dollar thereof; of those bearing 5½ per cent. interest, 65 to 68 cents; and of those bearing 6 per cent., about 54 cents.

It thus appears that while the bonds of the District were in default when the plan that is now submitted for confirmation was devised and were then valued at greatly depreciated prices, as a result of the plan, partially at least, these securities have more than doubled in value.

This showing, coupled with the large majority approval of all those creditors who are affected by the plan, comes close to demonstrating that the plan "is fair, equitable, and for the best interests of the creditors, and does not discriminate unfairly in favor of any class of creditors."

The small minority of objecting creditors assert that notwithstanding this apparently favorable showing, as far as affected creditors are concerned, it should not be approved, because, as previously stated, it impairs their lien rights under the California Irrigation District Act as that law stood at the times of the first and second issues of bonds by the District. They claim that the first issue is superior, paramount and prior to all other issues, and that the second has the same status except as to the first, and that therefore the court should so classify such bonds as the objectors own, and relegate all other and consenting bonds on a parity but subordinate to them.

Preliminarily it should be noted that subdivision (b) of section 80, 11 USCA § 303 (b) specifies that: "A plan of readjustment within the meaning of this chapter (1) shall include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through the issuance of new securities of any character or otherwise; and (2) may contain such other provisions and agreements, not inconsistent with this chapter, as the parties may desire."

The matter just quoted might be interpreted to mean that valid and existing liens can be disturbed and impaired in taxing districts' debt readjustments under the addition of May 24, 1934, to the National Bankruptcy Act. Compare Rock Island Railway Reorganization Case, supra. Such construction is unnecessary in this proceeding, my conclusion in this matter as to the asserted lien of bonds of the first and second issues being controlled by local law.

Section 40 of the California Irrigation District Act (St. 1897, pp. 254, 267), in effect until subsequent to the first and second issues of the bonds of the District, provides: "The assessment upon real property is a lien against the property assessed from and after the first Monday in March for any year, and the lien for the bonds of any issue shall be a preferred

lien to that for any subsequent issue, and such lien is not removed until the assessments are paid, or the property sold for the payment thereof." This section was amended effective July 27, 1917 (St. 1917, pp. 751, 768) to read: "The assessment upon land is a lien against the property assessed from and after the first Monday in March of any year."

The record in this proceeding shows that 42 per cent. of all issued bonds of the District were issued under section 40 as originally enacted, the remaining 58 per cent. of the District's bonded indebtedness having been created under the law as changed on July 27, 1917. Nevertheless, it is significant of the attitude of the investors concerning the plan that a relatively small amount of the bonds of the first two issues are represented by those objecting to the plan of debt readjustment, although wide publicity and solicitations have occurred by groups fostering and opposing the plan that is submitted for approval in this proceeding.

 It is clear that if there were no other and coefficient provisions respecting the bonds issued by the District in the California Irrigation District Act as it existed at the respective dates of the first two issues, those owning such bonds would have a preferred status over bond owners of subsequent issues. I think it is settled law that state legislation, by authority of which bonds are issued and their payment provided for, becomes a constituent part of the contract with bond owners. Such a contract is within the protection of the tenth section of article 1 of the Constitution. Selby v. Oakdale Irrigation District, 140 Cal. App. 171, 35 P.(2d) 125; Hershey v. Cole, 130 Cal. App. 683, 687, 20 P.(2d) 972; St. Louis Union Trust Co. v. Franklyn-American Trust Co. (8 C. C. A.) 52 F.(2d) 431, 87 A. L. R. 386; Rorick v. Board of Com'rs of Everglades Drainage District (3-judge case, D. C. Fla.) 57 F.(2d) 1048. Compare the recent California Supreme Court decision in County of Los Angeles v. Rockhold, Surveyor, 44 P.(2d) 340, on extent of power of state legislature over irrigation district affairs in relation to conjunctive force of remedial national and state statutes in chapter 9 of the Bankruptcy Act (11 USCA §§ 301–303) and chapter 4, p. 5, of Extra Sess. 1934 of the California Legislature.

 An examination of the entire Irrigation District Act as effective on the dates of the two issues under consideration manifests that no priority as claimed by the objectors could have been intended, and that none such exists. It is not proper in interpreting a statute to detach and isolate parts to the exclusion of co-operative provisions in it. The statute must be considered and construed as a whole and in its entirety. When the applicable laws are so regarded, I think it is clear that those in force and that governed the first two issues contemplated the issuance of bonds recurrently and from time to time whenever it is necessary for a district to raise money to carry out the provisions of the act, and that all such bonds stood on a parity. The bonds ex proprio vigore are not liens in an enforceable legal sense. They are motivating instrumentalities for the levy of an annual assessment upon all lands of the District. It is the assessment that is the lien, and the assessment is levied to meet all bond obligations indiscriminately. See Boskowitz v. Thompson, 144 Cal. 724, 730, 78 P. 290.

Section 30 of the state law in effect at the time of both issues (St. 1897, p. 263, as amended by St. 1917, p. 761) provides that the directors must determine the amount of money necessary to be raised for the purpose of the act "whenever thereafter the board of directors shall find that the construction fund raised by the last previous bond issue is insufficient."

Section 31 of the applicable act (St. 1897, p. 264, as amended by St. 1919, p. 665) provides: "Each issue of the bonds of a district shall be numbered consecutively as authorized, and the bonds of each issue shall be numbered consecutively."

Section 34 (St. 1897, p. 265, as amended by St. 1911, p. 514) provides for the levy of a special assessment to meet obligations in the event moneys raised by the sale of bonds are insufficient for that purpose, and "additional bonds be not voted." An annual assessment to meet outstanding coupons is authorized at a specified time, and section 33 (St. 1897, p. 265, as amended by St. 1917, p. 764) provides that: "Said bonds and the interest thereon shall be paid from revenue derived from an annual assessment upon

the land within the district; and all the land within the district shall be and remain liable to be assessed for such payments as hereinafter provided."

It thus appears that any number of successive issues of bonds is anticipated by the act, and that a general obligation is created by each issue and each bond is payable through unlimited ad valorem assessments upon all of the lands of the District. Roberts v. Richmond Irrigation District, 289 U. S. 71, 53 S. Ct. 519, 77 L. Ed. 1038.

When the method of payment of the bonds and their coupons is considered, it is made more clear that no preference or priority of any one bond over another is intended by the act as a whole, notwithstanding the apparently contradictory terms of section 40 as it stood when the first two issues became effective (St. 1897, p. 267). This mode of payment is found in section 52, which in the Act of 1897, p. 272 provided: "Upon the presentation of the coupons due, to the treasurer, he shall pay the same from the bond fund." There is no distinction or latitude justified on the part of the treasurer. He is compelled to pay upon presentation. This negatives any preferential right as between bonds of different issues.

■ The reasons that justify the conclusion that no preferential rights are attributable among any of the first four bond issues of the District also dispose of a trust fund theory that is advanced by the objecting bond owners. There is no way of tracing a trust so as to impress it upon a fund for the exclusive use of a particular bond or issue of bonds. Under such circumstance, there is no enforceable trust.

■ Finally, it is imperative, because of the general inability of landowners to meet assessments and the corresponding depreciation of securities of public taxing districts, that where more than the legally required majorities of creditors affected deliberately approve a debt funding scheme, the court should apply section 80 to readjust the fiscal affairs of such bodies to carry out such majority action, notwithstanding its binding effect upon a nonassenting minority.

The Supreme Court said in approving a Canadian method of relieving a financially embarrassed railway company of its unmeetable bond obligations against the protest of dissatisfied investors, in Canada Southern R. Co. v. Gebhard, 109 U. S. 527, 3 S. Ct. 363, 369, 27 L. Ed. 1020: "The confirmation and legalization of 'a scheme of arrangement' under such circumstances is no more than is done in bankruptcy when a 'composition' agreement with the bankrupt debtor, if assented to by the required majority of creditors, is made binding on the non-assenting minority. In no just sense do such governmental regulations deprive a person of his property without due process of law. They simply require each individual to so conduct himself for the general good as not unnecessarily to injure another. Bankrupt laws have been in force in England for more than three centuries, and they had their origin in the Roman law. The constitution expressly empowers the congress of the United States to establish such laws. Every member of a political community must necessarily part with some of the rights which, as an individual, not affected by his relation to others, he might have retained. Such concessions make up the consideration he gives for the obligation of the body politic to protect him in life, liberty, and property. Bankrupt laws, whatever may be the form they assume, are of that character." And in that case the court added: "It is in entire harmony with the spirit of bankrupt laws, the binding force of which, upon those who are subject to the jurisdiction, is recognized by all civilized nations. It is not in conflict with the constitution of the United States, which, although prohibiting states from passing laws impairing the obligation of contracts, allows congress 'to establish * * * uniform laws on the subject of bankruptcy throughout the United States.' Unless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized, the scheme may fail."

I think the language just quoted is applicable and decisive here, especially as the same court said in the Rock Island Railway Reorganization Case, supra, in discussing the authoritative force of such language in other cases: "It is unnecessary to consider the criticism, sometimes made, that these excerpts are dicta merely, since we are of opinion that they are sound in principle."

In my opinion, the plan set forth by the petition and established by the evidence in this proceeding is fair, equitable, and for the best interests of the creditors, and does not discriminate unfairly in favor of any class of creditors, and complies with all requirements of section 80 of the National Bankruptcy Act as added May 24, 1934 (11 USCA § 303).

It is accordingly so ordered; and it is further ordered that upon proof of compliance with the last proviso of subsection (k) of said section 80, a decree finally confirming said plan will be entered herein.