In re MERCED IRR. DIST.

No. 4818.

District Court, S. D. California, N. D.

Jan. 10, 1939.

Downey, Brand & Seymour and Stephen W. Downey, all of Sacramento, Cal., and C. Ray Robinson and Hugh K. Landram, both of Merced, Cal., for petitioner.

W. Coburn Cook, of Turlock, Cal., for respondents Milo W. Bekins et al.

Chase, Barnes & Chase and Lucius F. Chase, all of Los Angeles, Cal., for respondents R. D. and Belle Crowell

Clark, Nichols & Eltse and George Clark, all of Berkeley, Cal., for respondent Mary E. Morris.

Charles L. Childers, of El Centro, Cal., for respondent West Coast Life Ins. Co.

Peter tum Suden, of San Francisco, Cal., for respondents Minnie E. Rigby et al.

Hugh K. McKevitt and Newell J. Hooey, all of San Francisco, Cal., for respondent Pacific Nat. Bank of San Francisco.

Freidenrich & Selig and David Freidenrich, all of San Francisco, Cal., for respondent Claire S. Strauss.

Brobeck, Phleger & Harrison and Robert H. Walker, all of San Francisco, Cal., for respondents Florence Moore et al.

McCORMICK, District Judge.

Merced Irrigation District, hereinafter called "the District," pursuant to Chapter 9 of the Bankruptcy Act of 1938, section 81 et seq., 11 U.S.C.A. § 401 et seq., has filed its petition for confirmation of a plan of composition of bond indebtedness. The constitutionality of the provisions of the Bankruptcy Act that are invoked by the District is unquestionable. United States v. Bekins, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137.

The factual basis for the application to effect a composition of its bonded indebtedness of $16,190,000 principal and about $6,000,000 accrued and unpaid interest by scaling such debt structure to approximately $8,338,000 with interest at 4 per cent. from about October 1, 1935, is the utter inability of the District to service the outstanding bonds under applicable laws of the state of California, and it is clear from the record before us that if the debt structure of the District includes the original and uncancelled bonds, the District is hopelessly insolvent and the land owners within it will ultimately be in similar situations.

The primary question then to be determined is the status in this proceeding of the Reconstruction Finance Corporation, which for brevity will be designated as "R. F. C." This agency of the United States has acquired and now controls more than 90 per cent. of the bonds of the District, and its consent to the District's plan of debt reduction accompanies the petition. Is it a creditor of the District owning securities affected by the plan of debt composition?

We think the question must be answered in the affirmative.

Section 82 of the Act under consideration, 50 Stat. 653, 11 U.S.C.A. § 402, defining various entities that are involved in the debt composition proceedings of irrigation districts, states that "The term 'creditor' means the holder of a security or securities.", and that "Any agency of the United States holding securities acquired pursuant to contract with any petitioner under this chapter shall be deemed a creditor in the amount of the full face value thereof.", and further that "The term 'security affected by the plan' means a security as to which the rights of its holder are proposed to be adjusted or modified materially by the consummation of a composition agreement."

The clear effect of the evidence justifies the conclusion that the R. F. C. is a creditor and bondholder to the principal amount of $14,702,000 and accumulated interest on such outstanding bonds of the District as the R. F. C. now has under its control. The record shows that the R. F. C. has paid to the former owners of the bonds $515.01 for each $1,000 bond. Unconditional bills of sale have been regularly executed by the former owners or agents of former owners to the R. F. C. upon the acquisition of $14,071,000 of the bonds, and of the remaining $631,000 of the bonds bought by the R. F. C. a formal bill of sale was waived by it on delivery to it of the bonds upon payment by it to the former owners of the agreed price.

All of the bonds that have been so acquired have been, subsequent to delivery, duly registered in the name of the Reconstruction Finance Corporation as owner thereof, and all of such bonds at all times since their delivery to the agent and designated depository of the purchaser have been subject to the sole control of the R. F. C.

It is true that concurrently with the transactions whereby the bonds were purchased, the R. F. C. agreed to loan and did conditionally loan for the benefit of the District approximately $7,600,000. This money, however, was disbursed not to the District but to the former bond owners. The financial arrangement was not merely a matter of the lender, upon the collateral security of outstanding bonds, advancing money to the borrower upon the promissory note of the borrower to repay

with interest at the rate of 4 per cent. per annum, but the chief purpose and specific mutual intent of the agreement, as reflected in the writings, resolutions and transactions, was to effect a retirement of the outstanding bonds, and upon a situation being available whereby this could be done, to the satisfaction of the R. F. C., the District was to issue and deliver new refunding bonds to the R. F. C. for the amount of its cash outlay, with interest at 4 per cent. per annum, at which time the R. F. C. would surrender its presently possessed bonds for retirement, and the bond debt of the District would be reduced accordingly. No one can read the record of the negotiations between the governmental agency and the insolvent District and its security holders and fail to conclude that the paramount, imperative and essential feature of the contract was the ultimate and not the immediate retirement of the outstanding bonds which the R. F. C. acquired. This was the objective of the deal, and the failure to attain it renders the whole refinancing project that was agreed to, insecure and dubious. To adopt a contrary interpretation of the agreement would defeat the purpose which the parties who made it sought to accomplish. This must be avoided. If such is the intention of the parties to the contract, it is obvious that the R. F. C. is a creditor whose security is affected by the plan under consideration.

In other words, we think that the clear intent of the parties to the transaction whereby the advancement of money sufficient to retire the outstanding bonds, none of which were owned by the District, was that such bonds as were relinquished and sold to the R. F. C. in the debt readjustment project were to be kept alive and available for further protection of the lender until such time as the R. F. C. concedes that the contractual scheme of refinancing the District pursuant to the agreement is complete. This scheme is definitely predicated upon the ultimate merger of all affected outstanding obligations into the later and new security inuring to the R. F. C. under the various writings and documents that have been introduced into the evidence and which constitute the contract. See In re Drainage District No. 7, D.C.Ark., 25 F.Supp. 372; Slupsky v. Westinghouse Electric & Mfg. Co., 8 Cir., 78 F.2d 13, and compare Security-First National Bank v. Rindge Land & Navigation Co., 9 Cir., 85 F.2d 557, 107

A.L.R. 1240; Mowry v. Farmers' Loan & Trust Co., 7 Cir., 76 F. 38. The event, upon the happening of which the outstanding bonds would, under the contract, cease to be existing obligations of the District, has not yet occurred, and therefore all of such outstanding bonds constitute present obligations to the face value thereof and must be so regarded in evaluating the financial condition of the District in the plan of debt composition before this court.

And notwithstanding the time of acquisition of bonds by the R. F. C., the clear language of subparagraph (j) of Section 83 of the Bankruptcy Act of 1938, 11 U. S.C.A. § 403(j), conclusively determines the proprietary status of the R. F. C. over the bonds surrendered by consenting bondholders and delivered to the R. F. C., as well as the right of the R. F. C. to have the bonds that were acquired by the disbursement of its money included in the counting of the consenting creditors in determining the percentage of the securities affected by the plan of composition submitted by the District. Subparagraph (j) of Section 83 reads: "The partial completion or execution of any plan of composition as outlined in any petition filed under the terms of this Act [title] by the exchange of new evidences of indebtedness under the plan for evidences of indebtedness covered by the plan, whether such partial completion or execution of such plan of composition occurred before or after the filing of said petition, shall not be construed as limiting or prohibiting the effect of this Act [title], and the written consent of the holders of any securities outstanding as the result of any such partial completion or execution of any plan of composition shall be included as consenting creditors to such plan of composition in determining the percentage of securities affected by such plan of composition."

Much of the argument advanced by the minority groups of objecting bondholders overlooks the chief governmental purpose of the Congress in enacting Chapter 9 of the new Bankruptcy Act, beside leaving out of consideration the manifest intent of the R. F. C. as shown by the documentary evidence in extending the loan with which it was made possible for the District to continue to function as an irrigation district under prevalent economic and agricultural conditions and the laws of the state of California. Both of these governmental agencies operated to forestall col-

lapse of the District that was imminent under the record before this court. When the District went into default upon its bonds and before the R. F. C. approved the conditional loan to the District, its bonds were selling for eighteen cents on the dollar.

Under applicable statutes of the state of California, in the last analysis the bond owner in an irrigation district depends upon the earning or producing power of the land within the district for any return upon his investment or payment of his bond. The evidence before us shows that at the time default occurred in the bonds in 1933 the land of the District as a whole did not and could not be made to pay its cost of operation and consequently the land owners were unable to pay the assessments to service the bonds. This condition of delinquency continued and even became more aggravated by pyramiding unpaid assessments under applicable state laws year after year, until shortly prior to the availability of the plan embodied in the petition now before this court it had reached an aggregate delinquency of 62 per cent. It was undoubtedly this impoverished condition of the District that kept depreciating the bonds. And according to credible testimony at the hearing, the productivity of the land within the District, and its revenue, is little, if any, better than it was in 1933 when the defaults in the bond indebtedness commenced.

But it is argued, assuming that the R. F. C. is the owner and holder of about $14,702,000 of existing and outstanding bonds which have been relinquished and voluntarily transferred by their former owners, the plan should be held to be unfair and inequitable to the bondholders who held out and are now before the court opposing the plan of settlement, because, they assert, the present financial condition of the District does not justify such an extreme paring of the debt structure as the plan accomplishes. We think this contention loses its force when consideration is given to the fact that it was the more than 90 per cent. of the bondholders who took advantage of the R. F. C. composition agreement and transaction which made it possible for the District to save itself from financial ruin and thereby to a major degree brought about the present fiscal situation which the records in evidence show exists in the District. These conclusions are more than justified by the Benedict testimony and report and by the evidence of the witness Momberg. In our opinion there can be little doubt that under the record, if the loan from the Reconstruction Finance Corporation had not been negotiated, the outstanding bonds of the dissenting bondholders would be worth much less than the price that can now be received by them under the plan that is before us for consideration. We consider as most forceful, irrefutable evidence of the fairness of the plan the indisputable fact that more than 90 per cent. of the invested capital in the bonds of the District has taken advantage of it. The legal requirement of debt composition under Chapter 9 of the Bankruptcy Act has been exceeded by nearly 25 per cent. of the affected invested capital.

A proposal of dissenting bondholders asks this court to modify the plan under consideration by giving them 100 per cent. of the principal of their bonds respectively and in addition approximately one-half of the interest that has accrued under their bonds according to the terms thereof since July 1, 1933. This, if adopted by the court, would enable less than 10 per cent. of the bondholders of the District to reap an unjust enrichment at the expense of more than 90 per cent. of the same class of bondholders who have accepted the plan and who have voluntarily ended any control over their bonds for approximately fifty cents on the dollar. Such is undoubtedly the effect of the proposal of the nonconsenting bondholders, because under it they are permitted to retain the outstanding bonds which they now own or control and merely conditionally agree to accept a reduction of interest on all coupons, matured and unmatured, to 3 per cent. per annum in lieu of 5½ or 6 per cent. stipulated in the bonds. We believe the suggested modification to be inequitable, discriminatory, illegally preferential and unjust. It not only financially penalizes approximately 91 per cent. of the bondholders who consented to the plan before the court, and for no reason except that such bondholders did consent, and thereby contributed to bring about the present improved outlook for the District, but it also classifies the bondholders of the Merced Irrigation District into two groups or classes, when in equity and fair treatment in a composition under the Bankruptcy Act of 1938 all of such bondholders should be considered on an equality and dealt with on

parity. We also believe that the court by approving the suggested change would jeopardize if not injuriously upset present and prospective necessary improvements in the District, throw its entire contractual arrangement with the Reconstruction Finance Corporation into uncertainty, and encourage unjustifiable delay in the adjustment and settlement of the financial status of the District. The R. F. C. has signified no willingness to advance more money to the retirement of the bonds than it has under the contract already made, and it cannot be required to do so by this court. We cannot alter the agreement under which the District and all financially interested in it were saved from forced liquidation which would have caused greater loss than the bond investors are to take under the plan.

We think it a fair deduction from the evidence to state that the current hopeful fiscal condition of the District is attributable, as already stated, primarily to the money advanced by the R. F. C. which was conditionally paid for the purpose of preventing the collapse of the District by supplying money for the retirement of the outstanding bonds, so as to substantially reduce the bonded indebtedness, and secondarily to a providential water supply during the last two or three years which has enabled the District to earn unprecedented revenue from its power facilities. But the experiences of the past, as shown by the record before us, do not warrant a finding that power revenue conditions similar to those existing will continue in the future, and it would be injudicious to venture the further financial ability of the District to meet its obligations upon problematical water sources or conditions. This would be too dubious a situation to warrant adoption by the court.

There are, we think, but two further contentions of the dissenting bondholders which require discussion. These may be disposed of briefly.

■ Prior to the institution of this proceeding the District, in line with recurring attempts to extricate itself from impending financial destruction occasioned by uncollectible tax requirements to service its bond obligations, sought to avail itself of an Act of Congress (30 Stat. 544, 11 U.S. C.A. § 1 et seq.), providing for the readjustment of the debt of political subdivisions of the state. The purpose of such action was effectively the same as the proceeding now before the court. After hearing and consideration, this court on March 6, 1936, held that the plan which is again submitted was fair, equitable and non-discriminatory to all bondholders and creditors affected thereby, and the court at that time entered a decree so adjudging and directing confirmation of the plan, which required the minority dissenting bondholders, who are again opposing the plan set forth in the present petition, to participate and accept $515.01 for each $1,000 bond and coupons.

From such decree, the dissatisfied group of investors took an appeal to the Ninth Circuit Court of Appeals, and before the same could be heard therein, the United States Supreme Court in Ashton v. Cameron County Water Improvement District, 298 U.S. 513, 56 S.Ct. 892, 80 L.Ed. 1309, declared the Congressional legislation, under which the proceeding was commenced and decided, to be unconstitutional.

Thereafter, upon motion of appellants for reversal of the decree of this court, based and stated to be solely and entirely upon the Supreme Court decision of unconstitutionality of the statute authorizing the proceeding, the appellate court granted the motion and pursuant thereto reversed the decree of the District Court and by mandate directed this court to dismiss the entire cause. Bekins v. Merced Irr.Dist., 9 Cir., 89 F.2d 1002. A petition for the writ of certiorari was denied by the Supreme Court. 302 U.S. 709, 58 S.Ct. 30, 82 L.Ed. 548.

The nonconsenting bondholders contend that the judgment of dismissal in the earlier proceeding is a conclusive determination that adjustment of debtor-creditor relations represented by the dissenters' bonds is beyond the bankruptcy power of Congress, and that this court cannot be given jurisdiction to make such readjustment. The argument stated in other terms is that the doctrine of res judicata is applicable to this proceeding because the parties are the same as well as the subject matter and the relief sought, as was the case in the former void action.

We think the plea of former adjudication is not available. The court in the proceeding under the unconstitutional law functioned in an utterly powerless environment. Its processes ab initio were coram non judice, and had no force or authority.

The sole basis for judicial action is law, and if there be none, as was the case in procedure under the ineffectual and void Section 80 of the Bankruptcy Act, 11 U.S.C.A. § 303, the assumed court action is a nullity and neither confers nor withdraws rights.

█ The impotency of the court under the old Act of Congress to affect in any way the status of debt structure of the District necessarily leaves the subject matter of debt composition open and undecided. It is still within the legislative field of Congress under the bankruptcy clause of the Constitution. United States v. Bekins, 304 U.S. 27, 58 S.Ct. 811, 82 L.Ed. 1137; Adair v. Bank of America, 303 U.S. 350, 58 S.Ct. 594, 82 L.Ed. 889. In other words, as has been so aptly expressed by the Supreme Court in Manhattan Life Ins. Co. v. Broughton, 109 U.S. 121, 3 S.Ct. 99, 100, 27 L.Ed. 878, "A trial upon which nothing was determined cannot support a plea of res adjudicata, or have any weight as evidence at another trial."

We think that not only was the judgment in the former proceeding wholly void because not based upon law, but by the same token we are confident that the court had no jurisdiction whatever in the matter. Under such circumstances res judicata cannot be invoked in the later action, for as the Supreme Court, speaking through Justice Holmes in Murray v. City of Pocatello, 226 U.S. 318, 33 S.Ct. 107, 57 L.Ed. 239, said [page 108], "Of course, if the court was not empowered to grant the relief whatever the merits might be, it could not decide what the merits were."

█ The final plea of the objecting bondholders is that because of the filing and prosecution by the District of a proceeding in the Superior Court of Merced County, State of California, under an Act of the Legislature of California, passed in 1937 and officially known in short title as "Irrigation District Refinancing Act" (Stat.Cal.1937, Ch. 24, p. 92), this court has no jurisdiction to proceed with the hearing and determination of this matter.

The action was filed on or about July 27, 1937, and prior to the enactment of the Congressional legislation upon which this federal court proceeding is based. Its object was to effectuate under the aforesaid state law the same plan that is the basis of this proceeding pursuant to Chapter 9 of the Bankruptcy Act, and the identical parties appear in the two forums.

The matter proceeded to hearing in the state court and over objections of dissenting bondholders, who now oppose this proceeding, the Superior Court on March 10, 1938, held the state law to be valid and constitutional and directed that findings and an interlocutory judgment confirming the plan be entered pursuant to Section 8 of the state act, St.1937, p. 96. No findings or judgment have been entered, and nothing further has been done in the state proceedings. The matter is still pending therein.

This bankruptcy proceeding was filed in this court June 17, 1938.

We believe there is a serious question as to the constitutionality of the California "Irrigation District Refinancing Act." It comes very close to impairing, if it does not actually impair, the obligations of contracts, and thereby transcends state legislative power, United States Constitution Art. 1, Sec. 10, cl. 1, U.S.C.A.; In re Imperial Irrigation District, D.C., 10 F.Supp. 832; but we are not disposed to consider the constitutionality of the state law until the California courts of appeal have considered and passed upon it. In re Boswell, D.C., 20 F.Supp. 748. Moreover, we think it unnecessary to pass upon the validity of the state law, as we think there can be no merit in the objections to this court's jurisdiction under the broad grant of national power in debt composition matters.

█ The constitutional power of Congress to establish "uniform laws on the subject of bankruptcies throughout the United States" is paramount to powers of the states and it is firmly established in the United States that the "subject of bankruptcies" is nothing less than the subject of the relations between an insolvent or nonpaying debtor and his creditors, extending to its or their relief. Continental Bank v. Chicago, Rock Island Railway, 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110.

█ And when the jurisdiction of the federal court is constitutionally invoked under an existing Act of Congress relating to the subject of bankruptcy, as it has been in this proceeding, it is exclusive of all other courts, U. S. Fidelity, etc., Co. v. Bray, 225 U.S. 205, 32 S.Ct. 620, 56 L.Ed. 1055; and particularly is this the case when, as here, the state court has not pro-

ceeded to the making of any findings of fact or to the entry of any decree adjudging or purporting to adjudge rights.

 A court of bankruptcy itself is powerless to surrender its control of the administration of the estate. Isaacs v. Hobbs Tie & T. Co., 282 U.S. 734, 51 S.Ct. 270, 75 L.Ed. 645; Moore v. Scott, 9 Cir., 55 F.2d 863; In re A. C. Wagy & Co., 9 Cir., 20 F.2d 638.

We think that the state court proceeding from any point of view is wholly immaterial to this bankruptcy matter.

 Certain of the objecting bondholders argue that the plan under consideration is unfair and not for the best interest of the creditors of the District because it discriminates in favor of owners of other bonds issued by cities, drainage districts and school districts which lie within the area of the Merced Irrigation District and whose obligations are unimpaired by this proceeding. It is similarly argued that the same situation exists as to the obligations incurred by mortgages and deeds of trust upon lands within the District, none of these securities being included in the plan.

The aggregate amount of other outstanding bonds, as far as it is ascertainable from the exhibits in evidence, is relatively so small as compared with the outstanding bonds of the District, and the land within the District affected by such other outstanding bonds is so ununiform in relation to the area covered by the outstanding bonds of the District as to make it impracticable and inadvisable to require that such other obligations be taken into account in this proceeding before the plan under consideration is approved. And as far as the obligations of mortgages and trust deeds are concerned, we think that claims based upon them are clearly not to be classified the same as obligations evidenced by bonds which are serviced by assessments levied under taxing processes. The lien claims and rights of such securities are entirely dissimilar to bond obligations, under applicable laws of the state of California. If these collateral debts in the District must be considered and readjusted before a composition of the bond indebtedness of the District itself can be accomplished, the delay and difficulties attendant on such matters will destroy the efficacy of Chapter 9 of the Bankruptcy Act as far as the Merced Irrigation District is concerned.

 In conclusion, after deliberate consideration of the entire record in this proceeding, we find that the plan of Merced Irrigation District for the composition of its debts under Chapter 9 of the Bankruptcy Act of 1938, as alleged in the petition filed June 17, 1938, and as disclosed at the hearings in this court, is lawful in every respect, fair, equitable, and for the best interest of all creditors, and does not discriminate unfairly in favor of any creditor or class of creditors. The plan is accordingly confirmed.

Attorneys for the petitioner will prepare and present appropriate Findings of Fact, Conclusions of Law, and Interlocutory Decree confirmatory of the plan embodied in the petition.