**In re COLONIAL FORD, INC., Debtor.**

Bankruptcy No. 82M–00778.

United States Bankruptcy Court,
D. Utah.

Nov. 29, 1982.

Kim R. Wilson, Bryce D. Panzer, Snow, Christensen & Martineau, Salt Lake City, Utah, for Ford Motor Credit Co.

David E. Leta, Roe & Fowler, Salt Lake City, Utah, for debtor.

## MEMORANDUM OPINION

RALPH R. MABEY, Bankruptcy Judge.

### INTRODUCTION AND BACKGROUND

The Bankruptcy Code contains several provisions which promote the private, cooperative, negotiated rebuilding of financially distressed debtors. One of these measures, 11 U.S.C. Section 305(a)(1), is the subject of inquiry in this case. The facts relevant to this inquiry, briefly summarized, are as follows.

In January, 1977, Colonial Ford, Inc., the debtor, ceased operation as an automobile dealership. Since May, 1975, it has been embroiled in litigation with Ford Motor Company, Ford Motor Credit Company, the United States Small Business Administration, and other creditors. This litigation embraces three lawsuits, one of which has journeyed to the Tenth Circuit Court of Appeals and back and resulted in a judgment for $2,897,125 in favor of Ford Credit and against Colonial. Execution on this judgment and liquidation of the former dealership site, which Colonial continues to hold and lease to others, was enjoined by the district court pending resolution of these cases.

In July, 1981, Colonial and its creditors settled their differences.[1] The agreement, in essence, accomplished two objectives. First, with the exception of a single cross-

---

1. Details of the claims asserted and positions taken in this litigation, while reviewed by the parties in their memoranda in order to show the "bad faith" of one another, is not repeated. The ruling of the court, given below, is based upon the purpose of Section 305(a)(1) to further out-of-court workouts. Section 305(a)(1), while designed to prevent abusive filings of a particular variety and under special circumstances, does not require an analysis of "good faith" on the facts of this case. Moreover, the "bad faith," if any, was accounted for and superseded in the settlement. Thus, the background to the litigation has no significance. The progress from litigation to settlement, however, is important.

claim, it concluded all three lawsuits. Second, creditors reduced their claims and gave Colonial nine months to sell or refinance the dealership site; if this did not occur, a decree of foreclosure would be entered. Creditors, in other words, were willing to take less in exchange for an end to the litigation and swifter realization on their claims.[2]

Colonial was unable to sell or refinance the property and filed a petition under Chapter 11 on March 30, 1982. Ford Credit filed a motion to abstain pursuant to Section 305(a)(1) on June 1. This was heard July 15. The court ruled from the bench August 24. An order was entered September 27. This memorandum decision elaborates the basis for that ruling.[3]

## THE POLICY OF ENCOURAGING WORKOUTS

Section 305(a)(1) reflects a policy, embodied in several sections of the Code, which favors "workouts": private, negotiated adjustments of creditor-company relations.[4]

2. These reductions, with other concessions, were substantial. Ford Credit, for example, held a judgment for $2,897,125. An injunction barring execution, however, had prevented collection from the fall of 1976 until the settlement in 1981. The settlement reduced the judgment to $1,250,000, provided a moratorium on interest for all but $50,000 of this amount, and postponed foreclosure another nine months. All but three creditors, by default or acquiescence, are dealt with in the settlement. One of these, Ken Rothey, is counsel to and an officer of Colonial. He holds an attorneys lien on the unsettled cross-claim. The others, LeGrande Belnap and Doris Belnap, shareholders of Colonial, have a claim for wages.

3. Ford Credit also sought dismissal of the case for want of "good faith" under 11 U.S.C. Section 1112(b) and relief from the stay under 11 U.S.C. Section 362(d). By stipulation of the parties, these matters were heard with the motion to abstain under Section 305(a)(1) on July 15. At that time, Colonial was prepared to demonstrate, by calling five witnesses, its "good faith" and prospects for reorganization. The court, however, was unable to adjust its calendar to accomodate this amount of testimony and confined the parties to the time which had been allocated. Colonial expressed concern that this procedure would prejudice its case. The court observed that, if necessary, a subsequent hearing might be held.

Congress designed the Code, in large measure, to encourage workouts in the first instance, with refuge in bankruptcy as a last resort. As noted in the legislative history: "Most business arrangements, that is, extensions or compositions (reduction) of debts, occur out-of-court. The out-of-court procedure, sometimes known as a common law composition, is quick and inexpensive. However, it requires near universal agreement of the business's creditors, and is limited in the relief it can provide for an overextended business. When an out-of-court arrangement is inadequate to rehabilitate a business, the bankruptcy laws provide an alternative. An arrangement or reorganization accomplished under the Bankruptcy Act binds nonconsenting creditors, and permits more substantial restructuring of a debtor's finances than does an out-of-court work-out." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 220 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5787, 6179–6180. The reasons for blessing the workout are at least threefold.

The court is satisfied that it was appropriate to rule on the question of abstention without reconvening the hearing and receiving more evidence. The court assumed, for purposes of its ruling, that Colonial was in "good faith" and had a reasonable prospect for rehabilitation, and dismissal would not have been allowed for these reasons under either Section 305(a)(1) or Section 1112(b). Likewise, the court assumed that relief from the stay would not have been allowed under Section 362(d). Thus, the inability of Colonial to present evidence on these points was immaterial.

4. For a description and analysis of workouts, *see generally,* Billig, "What Price Bankruptcy: A Plea for 'Friendly Adjustment,'" 14 Cornell L.Q. 413 (1929); Coogan, Broude and Glatt, "Comments on Some Reorganization Provisions of the Pending Bankruptcy Bills," 30 Bus. Law. 1149, 1154–1160 (1975); Roberts and Lazarus, "When the Workout Doesn't Work Out—An Outline," 12 Real Prop.Prob.Tr.J. 437 (1977); Rome, "The Business Workout—A Primer for Participating Creditors," 11 U.C.C. L.J. 183 (1978); Statement of Peter F. Coogan, *Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 1st Sess., Ser. 27, pt. 1, at 394–397 (1975); Statement of Patrick A. Murphy, *id.* at 436–438, 478–488.

First, the workout is expeditious. Debtors and creditors, unbridled by bankruptcy, enjoy a flexibility conducive to speed. By contrast, the "bankruptcy machinery [of] today," may be "a very time-consuming and hydraheaded kind of delaying structure" which "frequently works to the detriment of creditors." *Hearings on S. 2266 and H.R. 8200 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 95th Cong., 1st Sess. 599 (1977). Indeed, it has been noted, apropos the settlement in this case, that "delay . . . . is the most costly element in any bankruptcy proceeding and particularly in a business reorganization. The same amount of money received by the senior creditors 4 years from now is worth probably less than half of what would be an amount of money received today. In other words, if [a creditor] can anticipate, after this elaborate procedure, [that he] will receive $1 million, then he would be well-advised and usually is anxious to take $500,-000 today because it's worth more to him. He has to consider the investment value and the ravages of inflation. This is worth more than the prospect of getting $1 million 4 years from now." *Id.* at 490. Many provisions in the Code were fashioned in response to this testimony and as inducements to alacrity in reorganization, including the expansive jurisdiction of the court, the opportunity for creditors to file plans, and modification of the absolute priority rule, to name three.[5] The assist to workouts complements these features of the Code.

Second, workouts are economic. Economy, of course, is improved through expedition, as noted above. But the workout is economic because it avoids the superstructure of reorganization: trustees, committees, and their professional representatives. These and other costs of administration push junior interests "under water," and because they must be paid at confirmation, diminish prospects for a plan. Moreover, bankruptcy may shipwreck relationships necessary to keep a business afloat. Customers are reluctant to deal with the manufacturer who may not survive to honor the warranty of his product or with the lessor who cannot guarantee the habitability of his premises. The cost of overcoming this reluctance, through marketing campaigns and the like, may be high. Sales will be difficult; prices may be low. Suppliers may dwindle. Costs of credit may increase. "[W]hen word of financial difficulty spreads, the debtor's own debtors often decline to pay as they would have in the ordinary course, suddenly reporting that the dresses were the wrong size, were the wrong color, or were not ordered." Coogan, Broude and Glatt, "Comments on Some Reorganization Provisions of the Pending Bankruptcy Bills," 30 Bus.Law. 1149, 1155 (1975). Likewise, "accounts receivable can deteriorate to an unbelievable extent as soon as word gets around that the debtor is headed for the cemetery." *Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 1st Sess., Ser. 27, pt. 1, at 483 (1975). These circumstances, among others, handcuff a debtor doing business in Chapter 11.

Third, the workout is sensible. Workouts contemplate, indeed depend upon, participation from all parties in interest, good faith, conciliation, and candor. The alternative is litigation and its bedfellows—bluff, pettifoggery, and strife. Moreover, the parties who are "on-site," and prepared by education or experience, are more able than a judge, ill-equipped in resources and training, to rescue a beleagured corporation. "The courtroom," after all, "is not a boardroom. The judge is not a business consultant." *In re Curlew Valley Associates,* 14 B.R. 506, 511 (Bkrtcy.D.Utah 1981). The problems of insolvency, for the most part, are matters for extra-judicial resolution, calling for "business not legal judgment." *Id.*

With these advantages in mind, the authors of the Code encouraged workouts in at least two ways.

---

**5.** Other antidotes for delay are detailed in *In re South Village, Inc.,* 25 F.Supp. 987 (D.Utah 1982).

First, the Code, "[l]ike a 'fleet-in-being' . . . may be a force towards mutual accommodation," and as such, sets parameters for negotiations preceding a workout. *Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 1st Sess., Ser. 27, pt. 1, at 396 (1975). Thus, for example, a creditor may be chary of dictating terms where this might result in the subordination of his claim. *Cf.* Douglas-Hamilton, "Creditor Liabilities Resulting From Improper Interference with the Management of a Financially Troubled Debtor," 31 Bus.Law. 343, 347–352 (1975); *In re American Lumber Co.,* 5 B.R. 470 (D.Minn.1980). A creditor must weigh the possibility that execution on a judgment will be effort wasted if bankruptcy ensues and his preference is avoided, *see, e.g., Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary,* 94th Cong., 1st Sess., Ser. 27, pt. 1, at 394–397 (1975), or that foreclosure will be for naught if the property must be turned over to the trustee, *see, e.g., id.* at 490–491. A debtor, likewise, may not break faith with creditors by preferring some over others, or by secreting assets, lest they file an involuntary petition.

Second, the Code, in several specific respects, contemplates that workouts will be a prelude to, yet consummated in, bankruptcy. Thus, for example, 11 U.S.C. Section 1102(b)(1), under certain circumstances, allows the continuation, as the official creditors committee, of a prepetition creditors committee. Similarly, 11 U.S.C. Section 1126(b), in some instances, validates prepetition acceptances of a plan. "Congress," according to one authority, "rejecting the opposition of the Securities and Exchange Commission, has provided a flexible reorganization procedure which accommodates prefiling reorganization procedures for both public and private corporations. A plan may be filed with the petition commencing a Chapter 11 case or at any subsequent time. Acceptances obtained before the commencement of the filing may be counted in the voting if there was adequate prepetition disclosure and, if necessary, 'compliance with any applicable nonbankruptcy law . . . . governing the adequacy of disclosure.' " Trost, "Business Reorganizations Under Chapter 11 of the New Bankruptcy Code," 34 BUS.LAW. 1309, 1325 (1979). Indeed, incentives to use "prepackaged plans" are "written all through the new Act." They lead to a "revolving door" in and out of Chapter 11. Aaron, "The Bankruptcy Reform Act of 1978: The Full-Employment-for-Lawyers Bill: Part V: Business Reorganization," 1982 Utah L.Rev. 1, 38.[6]

## SECTION 305(a)(1) AND THE POLICY OF ENCOURAGING WORKOUTS

Thus, the Code encourages workouts outside, or concluded inside, Chapter 11. Encouragement on both fronts is necessary because dissent from a workout may assume a variety of shapes. Creditors who would otherwise pursue their rights under state law are kept in tow because preferences may be undone following a petition in bankruptcy. Others may be bound, assuming a consensus in number and amount, through confirmation of a plan. What, however, of the maverick who threatens prematurely to disrupt out-of-court negotiations by an involuntary petition, or the party, creditor or debtor, who has "buyer's remorse" and seeks a recapitulation of the

**6.** As stated by the sponsors of the Code: "One cannot overemphasize the advantages of speed and simplicity to both creditors and debtors. Chapter XI allows a debtor to negotiate a plan outside of court and, having reached a settlement with a majority in number and amount of each class of creditors, permits the debtor to bind all unsecured creditors to the terms of the arrangement. From the perspective of creditors, early confirmation of a plan of arrangement: first, generally reduces administrative expenses which have priority over the claims of unsecured creditors; second, permits creditors to receive prompt distribution on their claims with respect to which interest does not accrue after the filing date; and third, increases the ultimate recovery on creditor claims by minimizing the adverse effect on the business which often accompanies efforts to operate an enterprise under the protection of the Bankruptcy Act." 124 Cong.Rec. H11,102 (daily ed., September 28, 1978).

settlement in bankruptcy? This form of dissent is the target of Section 305(a)(1) which provides:

(a) The Court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—

(1) The interests of creditors and the debtor would be better served by such dismissal or suspension.

Section 305(a)(1) evolved from Section 4–208(a) of the Commission proposal which permitted dismissal of an involuntary, but not a voluntary, petition which was not in the "best interests of the debtor and its creditors."[7] The Commission relaxed the standards for involuntary bankruptcy in the belief that early, albeit involuntary, relief against marginal enterprises would increase dividends available to creditors. Section 4–208(a) was the counterweight to this reform, safeguarding against the precipitate or malicious involuntary petition.[8]

Congress realized, however, at some point in the study and revision of the Commission bill, that abuse could occur in connection with voluntary as well as involuntary petitions. Hence, it rewrote Section 4–208(a) and moved it to Section 305(a)(1).[9] Moreover, it added Section 305(c) which makes any decision under Section 305(a)(1) nonappealable. This measure insulates the work-

---

**7.** Section 4–208(a) provided: "Upon the filing of an involuntary petition under section 4–205(c)(1) or (2), unless the debtor consents to relief or defaults, the court shall as soon as possible, in accordance with the Rules of Bankruptcy Procedure, hold a hearing to determine whether the relief sought is in the best interests of the debtor and its creditors. The petitioner shall have the burden of proving that relief is in the best interests of the debtor and its creditors. If the court determines that it is not, the case shall be dismissed. The court may require that the petitioner file a bond in such amount as the court may determine to indemnify the person against whom the petition is filed for such costs, counsel fees, expenses, and damages as may be allowed." Report of the Commission on the Bankruptcy Laws of the United States, H.Doc. No. 93–137, pt. II, at 77 (1973).

**8.** The notes to the Commission proposal observed: "Subdivision (a) recognizes that involuntary relief has been facilitated under the proposed Act. This has been done to allow creditors to force timely proceedings and to encourage voluntary proceedings while there is still a possibility of rehabilitation or before all assets are dissipated. It is also hoped that litigation will be avoided and expenses thereby saved. On the other hand, the need for protection of a business debtor from the devastating impact of the mere filing of an involuntary petition is recognized. This section supplies safeguards that are not found in the present Act, except as indirectly provided, both to debtors that should and those that should not be in proceedings, by technical niceties and the expense of litigation. The judge is given broad discretion to dismiss a case after hearing. The case may be dismissed even though the requirements of § 4–205(c)(1) or (2) are met. This is necessary since a debtor may temporarily be unable to pay debts or one creditor might properly force a liquidation that would harm creditors. The judge can best deal with these difficult cases, given adequate discretion. It is anticipated that Rules of Bankruptcy Procedure will treat the filing of the petition like the situation where there has been the issuance of a temporary restraining order and establish procedures similar to those found in Rule 65 of the Federal Rules of Civil Procedure. The petitioner must furnish a bond, if required by the court, indemnifying the debtor for damages allowed pursuant to § 4–210(f) if the case is dismissed." Report of the Commission on the Bankruptcy Laws of the United States, H.Doc. No. 93–137, pt. II, at 78 (1973).

**9.** The legislative history, by way of illustration, not prescription, points to an involuntary petition filed by a "few recalcitrant creditors." "A principle of the common law requires a court with jurisdiction over a particular matter to take jurisdiction. This section recognizes that there are cases in which it would be appropriate for the court to decline jurisdiction. Abstention under this section, however, is of jurisdiction over the entire case. Abstention from jurisdiction over a particular proceeding in a case is governed by proposed 28 U.S.C. § 1471[(d)]. Thus, the court is permitted, if the interests of creditors and the debtor would be better served by dismissal of the case or suspension of all proceedings in the case, to so order. The court may dismiss or suspend under the first paragraph, for example, if an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement, and an involuntary case has been commenced by a few recalcitrant creditors to provide a basis for future threats to extract full payment. The less expensive out-of-court workout may better serve the interests in the case." H.R.Rep. No. 95–595, *supra* at 325, U.S. Code Cong. & Admin.News, p. 6281.

out from time-consuming and expensive litigation and thus underscores the role of

Section 305(a)(1) in furthering out-of-court solutions to the rehabilitation of debtors.[10]

**10.** Published opinions by appellate courts which have been invited to review orders under Section 305(a)(1) are silent on the policy of encouraging workouts and its effectuation through Section 305(c). The Seventh Circuit, in *In the Matter of Covey,* 650 F.2d 877 (7th Cir.1981), declined to review a refusal to dismiss an involuntary petition, describing the request for review as "meritless," and pointing to "the plain language" of Section 305(c). *Id.* at 879. The Eighth Circuit, in *Buffington v. First Service Corporation,* 672 F.2d 687 (8th Cir. 1982), confronted the dismissal of a voluntary petition. The statement of facts reveals that the district court had affirmed the dismissal, but only after an examination on the merits, ignoring Section 305(c). The circuit court rejected the appeal as "essentially frivolous," and as "repetitious litigation," awarding double costs against the debtor and his counsel, *id.* at 690, but left the question of appealability under Section 305(c) in doubt by dealing with certain items of procedure and standing. A district court, in *Farmer v. First Virginia Bank of Fairfax County,* 22 B.R. 488 (E.D.Va.1982), faced with the dismissal of an involuntary petition, held that Section 305(c) was unconstitutional insofar as it proscribed review of constitutional issues, and that orders under Section 305(a)(1) raise questions of substantive due process and hence are appealable notwithstanding Section 305(c). *But cf. Harlow v. Sargent,* 14 B.R. 267, 8 B.C.D. 162 (D.Vt.1981) (disallowance of appeal under 28 U.S.C. Section 1471(d) is constitutional). *Farmer* appears to vitiate Section 305(c), since any party may obtain review of an order under Section 305(a)(1) by alleging that it violates substantive due process. Commentators, who like the district court in *Farmer* may be uneasy with a nonreviewable power of dismissal in bankruptcy courts, have questioned whether review may be available where the court bases its decision on factors other than the interests of creditors and the debtor, *see, e.g.,* Reed, Sagar and Granoff, "Subject Matter Jurisdiction, Abstention and Removal Under the New Federal Bankruptcy Law," 56 Am. Bank.L.J. 121, 142 (1982), or whether it may be obtained by mandamus, *see, e.g.,* Gaffney, "Bankruptcy Petitions Filed in Bad Faith: What Actions Can Creditor's Counsel Take?" 12 U.C.C.L.J. 205, 238 n. 165 (1979); Levin, "Bankruptcy Appeals," 58 No.Car.L.Rev. 967, 993–994 n. 200 (1980). *But see,* 1 Norton Bankruptcy Law and Practice § 9.16, at Part 9-Page 31 (1981). *These questions may underlie the prediction of other authorities that "[a]lthough [Section 305(c)] is apparently designed to avoid delay, it may generate further litigation. For example, when a case is dismissed, petitioning creditors may challenge Congress'[s] sweeping attempt in Section

305(c) to preclude all forms of judicial review, even in extraordinary cases." H. Miller and M. Cook, A Practical Guide to the Bankruptcy Reform Act 79 (1979).

That courts have overlooked the bias for workouts and against litigation reflected in Section 305(c) is remarkable, not only because of the plain meaning of the statute, but also because it is one of several measures where Congress interdicts appeals in favor of expedition and economy in the Code. Thus, 28 U.S.C. Section 1471(d) permits abstention in proceedings, as distinct from cases, and 28 U.S.C. Section 1478(b) allows remand of a proceeding removed from state or federal forums, with either decision being nonreviewable. *See, e.g.,* Levin, *supra* at 992–993.

Other measures, while not strictly analogous, are nevertheless instructive on the point of nonappealability, expedition, and economy. For example, 11 U.S.C. Section 1109(a) permits the United States Securities and Exchange Commission to raise and be heard on any issue, but forbids it the right to appeal from any decision in a case. This principle is restated and amplified in 11 U.S.C. Section 1125(d) which allows the SEC or any other "agency or official whose duty is to administer or enforce" a law governing disclosure to comment on a disclosure statement, but denies the SEC, agency, or official the right to "appeal from an order approving a disclosure statement." As noted in the House Report: "The SEC and State agencies will not have a right of appeal on the adequacy of disclosure, either in the role of an advisor to the court in reorganization cases, or in the role of the agency responsible for the enforcement of the securities laws generally. The disclosure hearing is the central hearing in the case, and in a case of any size will be a relatively long process. An appeal by an agency that had no direct interest in the case when none of those with money involved can be persuaded to take an appeal could cause delay to the detriment of the debtor, the creditors, and the stockholders. The denial of the right to appeal does not deny a right to participate in an appeal taken by a party in interest. It merely prohibits the SEC from initiating the appeal and being the only appealing party. As had frequently been pointed out in connection with the need for a valuation hearing, or diagnosis of the debtor, the patient may die on the operating table while the lawyers are diagnosing. The public protection policy of the securities laws must be balanced with the protection of creditors rights in bankruptcy cases, which is frequently facilitated by speed in the reorganization process." H.R.Rep. No. 95–595, *supra* at 229, U.S.Code Cong. & Admin.News, p. 6188. *See, e.g.,* Levin, *supra* at 979–981.

## APPLICATION OF SECTION 305(a)(1) IN THIS CASE

Colonial questions the applicability of Section 305(a)(1) in voluntary cases, and whether dismissal, under the circumstances of this case, "better serves" the interests of creditors and the debtor.[11]

### The Applicability of Section 305(a)(1) in Voluntary Cases

■ Section 305(a)(1) applies in any case, voluntary or involuntary, "under this title." This is consistent with the evolution of the statute, noted above, beginning as a bylaw in Section 4–208(a), and moving to general applicability in Chapter 3 of the Code.[12] Moreover, this reading is consistent with the policy to encourage workouts. It would be anomalous to protect workouts from involuntary petitions while leaving them vulnerable to voluntary petitions. Creditors would be protected from the renegades in their number who sought involuntarily to commit a debtor to bankruptcy, but they would have no similar check against debtors who compose their debts with the promise that matters will be left out of court and then stage an ambush in Chapter 11.

### Whether the Interests of Creditors and the Debtor are Better Served by Dismissal

Section 305(a)(1) permits dismissal where it will "better serve" the interests of creditors and debtors. The statute affords no guidance in defining the "interests" to be considered, nor does it delineate criteria for determining when parties will be better served in or out of bankruptcy.[13] Given the policies underlying Section 305(a)(1), however, the standards for dismissal may include speed, economy, and freedom from litigation. Other considerations may be fairness, priorities in distribution, capacity for dealing with frauds and preferences, and the importance of a discharge to the debtor. Cf. Kennedy, "The Commencement of a Case Under the New Bankruptcy Code," 36 Wash. & Lee L.Rev. 977, 1023 (1979). Not all of these factors will be

---

11. Colonial also argues that abstention is inappropriate because its composition occurred in federal not state court. Some cases have suggested that Section 305(a)(1) may be invoked only where insolvency proceedings have been initiated in a nonfederal forum. See, e.g., In the Matter of Lang, 5 B.R. 371, 374 n. 4 (Bkrtcy.S.D.N.Y.1980); In the Matter of Nina Merchandise Corporation, 5 B.R. 743, 747 (Bkrtcy.S.D.N.Y.1980). But see, In re Michael S. Starbuck, Inc., 14 B.R. 134 (Bkrtcy.S.D.N.Y. 1981) (SEC receivership in federal district court). This proposition, however, draws no support from the statute, and is contradicted by the legislative history, which far from centering on a particular forum, states a preference for settlements "worked out by creditors and the debtor *out-of-court.*" H.R.Rep. No. 95–595, *supra* at 325, U.S.Code Cong. & Admin. News, p. 6281. (Emphasis supplied.)

12. The authorities which have addressed this point concur. See, e.g., Kennedy, "The Commencement of a Case Under the New Bankruptcy Code," 36 Wash. & Lee L.Rev. 977, 1023 (1979) ("The authority of the court to abstain under Section 305 extends to a case filed under Section 301, 302, 303, or 304"); Reed, Sagar and Granoff, "Subject Matter Jurisdiction, Abstention and Removal Under the New Federal Bankruptcy Law," 56 Am.Bank.L.J. 121, 145 (1982) ("Although 305 will probably have its widest applications in involuntary cases, the provision by its terms applies as well to voluntary cases"). *Cf.* Samuels, "Unregulated Foreign Banks in Bankruptcy: Section 4 of the Bankruptcy Act," 23 N.Y.L.S.L.Rev. 47, 90–91 (1977).

Approximately 35 published opinions have dealt with Section 305(a)(1). None has *expressly* ruled that Section 305(a)(1) is applicable or inapplicable in voluntary cases. Several voluntary cases have been dismissed, however, under the aegis of Section 305(a)(1).

13. This paucity of guidelines has led to speculation over the scope of Section 305(a)(1). "It appears that in every case the court under § 305 *must consider* the interests of creditors and the debtor. Yet the word 'may' in § 305(a) suggests that the court may abstain or decline abstention even when it is doubtful that the interests of creditors and the debtor will be better served by the court's decision. Thus, the court arguably could consider factors other than the interests of creditors and the debtor in making its determination. Such other factors might include the views of regulatory authorities." Reed, Sagar and Granoff, "Subject Matter Jurisdiction, Abstention and Removal Under the New Federal Bankruptcy Law," 56 Am. Bank.L.J. 121, 142 (1982). (Emphasis in original.)

involved, nor will they assume equal importance, in every case. Hence, Congress intended the court to exercise considerable discretion in sifting and weighing grounds for dismissal under Section 305(a)(1). *See, e.g.,* H. Miller and M. Cook, A Practical Guide to the Bankruptcy Reform Act 79 (1979). *Cf.* Cook, "Involuntary Bankruptcy and the Proposed Bankruptcy Act of 1973: Reform at Last," 20 N.Y.L.F. 97, 117, 119 (1974); Note, "Involuntary Bankruptcy Under the Proposed Bankruptcy Act," 63 Geo. L.J. 187, 198–201 (1974) (critical of broad discretion and "substantial unresolved policy questions for judicial determination").[14]

### The Interests of Creditors

█ In this case, the interests of creditors are better served by dismissal. They agreed to a workout because it ended the litigation, and although they compromised their claims, the present value of the amounts to be realized at payout or foreclosure exceeded what they might have gained over time. This was not a workout where debt is rolled over with an eye to recovery, while recognizing the possibility of bankruptcy. Nor was it a workout where a deal was struck prepetition to be confirmed under the auspices of Chapter 11. Here the out-of-court composition was comprehensive, including virtually all creditors and the debtor. It was also final. A business which had lain dormant for years was not to be revived without the elimination of prior debt and the infusion of fresh capital.[15]

### The Interests of Colonial

Colonial argues that its interests are better served in Chapter 11; otherwise it would not have filed a petition. This argument, however, may be astigmatic for at least two reasons.

First, it ignores the question of who is the debtor for purposes of Section 305(a)(1). If the case is in Chapter 11, for example, the debtor will be a debtor in possession, and hence the trustee or fiduciary for the estate. The interests of the debtor, under these circumstances, are coincidental with the interests of creditors. Indeed, no debtor is an island, self-existent apart from its creditors who supply the capital, goods, and services necessary to his survival. This idea finds expression, not only in the construct of a debtor in possession, but also at common law where insolvent entities became funds managed in trust for the benefit of creditors. From this standpoint, the interests of creditors receive double weight under Section 305(a)(1), once from a partisan

---

14. It could be argued that a court should be more cautious where an involuntary case is brought under 11 U.S.C. Section 303(h)(2) which provides for the entry of an order for relief if "within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession." The legislative history observes that "once a proceeding to liquidate assets has been commenced, the debtor's creditors have an *absolute right* to have the liquidation (or reorganization) proceed in the bankruptcy court and under bankruptcy laws with all of the appropriate creditor and debtor protections that those laws provide." H.R.Rep. No. 95–595, *supra* at 323–324, U.S. Code Cong. & Admin.News, p. 6280 (emphasis supplied). The Commission bill, according to one observer, did not permit abstention from an involuntary case "where there has been a general assignment for the benefit of creditors or where a receiver, trustee, or a liquidating agent has been appointed to take charge of the debtor's property. Apparently, the Commission believes that in such a case, a liquidation was contemplated, and that creditors should be able to obtain the safeguards available under the Bankruptcy Act." Cook, "Involuntary Bankruptcy and the Proposed Bankruptcy Act of 1973: Reform at Last," *supra* at 117–118. The observer concludes that this is "sound" but "not convincing," since even in these cases, given certain facts, dismissal may be appropriate. *Id.* at 118. The Code may adopt these views, permitting dismissal under Section 305(a)(1) in a case involving Section 303(h)(2), but only in exceptional circumstances.

15. Indeed, Ford Credit, in reliance upon the settlement, has made payments of $50,000 in attorneys fees to Colonial, and $85,000 in property taxes to its shareholder. Colonial has not offered to refund these monies or otherwise unscramble performance under the agreement.

and again from a fiducial perspective.[16] In any event, the corporate debtor will be a complex of constituencies, including not only creditors but also a board of directors, management, and shareholders. These parties may be divided on some issues; even when united, their views may change from circumstance to circumstance, or from time to time. To say, with Colonial, that the debtor speaks with one voice on all occasions, and that its interests are circumscribed in the management's act of filing a petition, is oversimple.[17]

Second, it overlooks the benefits which debtors in general may derive from out-of-court workouts and which Colonial in particular obtained in this settlement. The choice to settle out of court rather than to file for reorganization, more often than not, will be enlightened. Management eager for asylum in bankruptcy may pause if faced with displacement by a trustee. Shareholders likewise must reckon with the prospect of a creditor's plan, wresting control of the business and eliminating their interest. Moreover, their equity, already thin or nonexistent, may not survive the burden of administrative debt. Debtors, as well as creditors, are familiar with the old saw that a "good" liquidation out of court is better than a "bad" reorganization in Chapter 11. Since the odds are stacked against obtaining confirmation of a plan,[18] and in light of the probability of conversion to Chapter 7, debtors may be well-advised, where their creditors are cooperative, to forego the dislocations and trauma, the depressed markets, the higher cost of money, and other disadvantages of bankruptcy, and work out an arrangement, even if it contemplates an eventual liquidation.

Colonial (or its shareholder, if she is the debtor) garnered these general benefits and two additional bonuses from its settlement. (1) Mrs. Belnap, by paying the SBA, may assume its right of redemption upon foreclosure of the property. This assumption, if exercised, is free and clear of any claim by Colonial or its creditors. This option, given the dictates of 11 U.S.C. Section 1129(b)(2)(B), might be unavailable to her in Chapter 11.[19] (2) Colonial may have grown weary of the protracted litigation, and realizing that it had reached a point of diminishing returns in court, sought disentanglement from its adversaries through the settlement. Colonial now seeks to keep the benefits of this compact, the reduction in debt, and avoid its burdens, the foreclosure,

---

**16.** Where the court decides whether to excuse a custodian from turnover under 11 U.S.C. Section 543(d), it must consider the interest of "equity security holders," *if "the debtor is not insolvent."* The legislative history notes that this provision "reinforces the general abstention policy in Section 305." H.R.Rep. No. 95–595, *supra* at 370, U.S.Code Cong. & Admin. News, p. 6326. This may imply that the interests of solvent and insolvent debtors, or at least the interests of shareholders in solvent or insolvent debtors, should receive different weight under Section 305(a)(1). *But cf.* 4 Collier on Bankruptcy ¶ 543.01, at 543–6 (15th ed.1981).

**17.** The fragmentation of the interest of a debtor under Section 305(a)(1) may explain, in part, those cases where abstention has been allowed because of intracompany disputes. *Compare, e.g., In The Matter of Win-Sum Sports, Inc.,* 14 B.R. 389 (Bkrtcy.D.Conn.1981) *with In re Donaldson Ford, Inc.,* 19 B.R. 425, 6 C.B.C.2d 564 (Bkrtcy.N.D.Ohio 1982); *In The Matter of Nina Merchandise Corporation,* 5 B.R. 743 (Bkrtcy.S. D.N.Y.1980).

**18.** Statistics are sparse. In this district, however, 261 petitions under Chapter 11 had been filed and were pending for over 6 months as of September 30, 1982. Of these, 43 or 16 percent had achieved confirmation. R. Wily, Estate Administrator's Report of Chapter 11 Cases iii (United States Bankruptcy Court, District of Utah, Third Quarter, 1982).

**19.** Unless the class of unsecured claims consents, Colonial would have to pay unsecured claims in full or eliminate any option to Mrs. Belnap. *See,* 11 U.S.C. Section 1129(b)(2)(B). It might be argued that Section 1129(b)(2)(B) codifies the absolute priority rule of former law, and therefore, insofar as Mrs. Belnap contributes "money or money's worth," she may participate notwithstanding failure to pay unsecured claims in full. *See, e.g.,* Carr, "When Can the Owners Participate in the Reorganized Debtor? Cram Down as a 'Shield' for Creditors," 15 Ind.L.Rev. 547, 556–560 (1982). It may be questioned, however, whether the subrogation of Mrs. Belnap to the rights of the SBA, so that she can redeem for her own benefit, would constitute the payment of money or money's worth to the reorganized debtor.

but this may not be done. An accord, with no satisfaction, releases parties from any duty to honor the compromise, and returns them to the *status quo ante*. The petition, therefore, may have revived the litigation in district court, with the risks and imponderables which prompted settlement in the first instance. There is no assurance that changing forums and prolonging the fight for another 7 years will produce a better bargain for Colonial.

These reasons motivated Colonial to make an agreement with its creditors which composed the debt and provided for sale, refinancing, or foreclosure of the property. The alternative of bankruptcy was available then, as now, and entered the calculus of decisionmaking, but was rejected in favor of the settlement. Colonial asserts, however, that reorganization better serves its interests at present. Attempting to divine the interests of Colonial, given this doublemindedness, is problematical. But even if full credit is given to its present protestations, these do not counterbalance the reasons for avoiding bankruptcy. Even assuming that the protestations and the reasons have equal weight, the policy of encouraging out-of-court workouts, embodied in Section 305(a)(1), dictates that the interests of Colonial are "better served" by the settlement than by a petition in Chapter 11.

## CONCLUSION

The Code encourages out-of-court workouts. Section 305(a)(1) is one of several instruments useful in achieving this goal. Because an order of dismissal under Section 305(a)(1) is nonreviewable, the statute should be invoked sparingly. Indeed, Section 305(a)(1) permits "suspension" as well as dismissal of a case, suggesting the possibility that efforts toward settlement may proceed on more than one front at the same time. Where, however, the workout is comprehensive, and designed to end, not perpetuate, the creditor-company relations, dismissal under Section 305(a)(1) is appropriate. One "reorganization," under these circumstances, is enough. Section 305(a)(1) precludes an encore, thereby furthering the policies of expedition, economy, and good sense.