**In re CHATEAUGAY CORPORATION; Reomar, Inc.; and LTV Corporation, Debtors.**

**The LTV CORPORATION, Plaintiff–Appellee,**

**The Official Committee of Unsecured Creditors of LTV Steel Company, Inc., Intervenor–Appellee,**

**v.**

**VALLEY FIDELITY BANK & TRUST COMPANY, as Trustee, Defendant–Appellant,**

**The New Connecticut Bank and Trust Company, N.A.; The Connecticut National Bank; Huntington National Bank; IBJ Schroder Bank & Trust Company; Maryland National Bank; and Team Bank, N.A., Intervenors–Appellants.**

**No. 727, Docket 91–5098.**

United States Court of Appeals, Second Circuit.

Argued Jan. 6, 1992.

Decided April 10, 1992.

See also 111 B.R. 67.

John A. Walker, Jr., Knoxville, Tenn., (Walker & Walker, of counsel), for defendant-appellant.

James J. Tancredi, Katherine Burroughs, Day, Berry & Howard, Hartford, Conn., of counsel, for intervenor-appellant The New Connecticut Bank and Trust Co., N.A.

Alan E. Lieberman, Ira H. Goldman, Deborah S. Frisone, Shipman & Goodwin, Hartford, Conn., of counsel, for intervenor-appellant The Connecticut National Bank.

Lawrence E. Oscar, Hahn Loeser & Parks, Cleveland, Ohio, of counsel, for intervenor-appellant Huntington National Bank.

Paul L. Bindler, Shalom Jacob, Rosenman & Colin, New York City, of counsel, for intervenor-appellant IBJ Schroder Bank & Trust Co.

Brooke Schumm III, Baltimore, Md. (Semmes, Bowen & Semmes, of counsel), for intervenor-appellant Maryland National Bank.

Judith W. Ross, Thompson & Knight, Dallas, Tex., of counsel, for intervenor-appellant Team Bank, N.A.

Karen E. Wagner, New York City (Maryellen Abely, Davis Polk & Wardwell; Arlene R. Alves, Kaye, Scholer, Fierman, Hays & Handler, of counsel), for plaintiff-appellee.

Lisa Rosenthal, New York City (Mark A. Speiser, Stroock & Stroock & Lavan, of counsel), for intervenor-appellee The Official Committee of Unsecured Creditors of LTV Steel Co., Inc.

Before OAKES, Chief Judge, PRATT and MINER, Circuit Judges.

OAKES, Chief Judge:

Valley Fidelity Bank & Trust Co. ("Valley") and intervenors appeal from a judgment of the United States District Court for the Southern District of New York, Shirley Wohl Kram, *Judge*, affirming a judgment of the United States Bankruptcy Court for the Southern District of New York, Burton R. Lifland, *Chief Judge*. The bankruptcy court granted partial summary judgment in favor of the debtor, the LTV Corporation ("LTV"), disallowing Valley's claims to the extent they included unamortized original issue discount ("OID"). On this appeal, Valley argues that the bankruptcy court and district court erred by holding (1) that new OID arose on an exchange of debt securities performed as part of LTV's failed attempt to avoid bankruptcy through a consensual workout, and (2) that amortization of OID should be calculated by the constant interest method, rather than by the straight line method. For the reasons set forth below, we reverse in part and affirm in part. We hold first that while claims must be disallowed to the extent of unamortized OID, no new OID arose on LTV's debt-for-debt exchange, and second, that OID amortization should be calculated by the constant interest method.

## FACTS

In July 1986, LTV, a steel company that makes defense and industrial products, filed for Chapter 11 reorganization along with sixty-six of its subsidiaries. LTV filed objections in September 1989 to two proofs of claim, numbers 20,069 and 20,067, filed in November 1987 by Valley on behalf of the holders of two securities, the "Old Debentures" and the "New Notes." Valley is the trustee for both the Old Debentures and the New Notes.

The Old Debentures are 13⅞% Sinking Fund Debentures due December 1, 2002, of which LTV had by December 1, 1982 issued a total face amount of $150,000,000. Of that face amount, $125,000,000 had been issued to the public, for which LTV re-

ceived $110,835,000 in cash. The remaining $25,000,000 had been issued to subsidiary pension funds, in lieu of cash contributions of $22,167,000. The proceeds received for the Old Debentures thus amounted to 88.67% of their face value.

The New Notes are LTV 15% Senior Notes due January 15, 2000. In May 1986, LTV offered to exchange $1,000 face amount of New Notes and 15 shares of LTV common stock for each $1,000 face amount of Old Debentures. As of June 1, 1986, $116,035,000 face amount of Old Debentures had been exchanged for the same face amount of New Notes and LTV Common Stock.

In its proofs of claim, Valley did not deduct any amount for unamortized OID. LTV objected to the claims and moved for partial summary judgment, seeking an order disallowing unamortized OID. LTV argued that unamortized OID is unmatured interest which is not allowable by virtue of section 502(b)(2) of the Bankruptcy Code, 11 U.S.C. § 502(b)(2) (1988), and that therefore the claims must be reduced by the amount of unamortized OID. A number of other creditors intervened to address questions of law that they believe may affect their own claims against LTV.

The bankruptcy court granted partial summary judgment for LTV. *In re Chateaugay Corp.*, 109 B.R. 51, 58 (Bankr. S.D.N.Y.1990). The court held that unamortized OID is not allowable under section 502(b)(2), and that the proper method for calculating unamortized OID is the constant interest method. *Id.* The court also held that as indenture trustee, Valley was the proper party in interest to receive notice of LTV's objections. *Id.* Concluding that the amount of unamortized OID on the Old Debentures could be calculated using uncontroverted evidence, but that the amount on the New Notes could not be calculated until a disputed fact—the fair market value of the Old Debentures at the time of the exchange—was resolved, the court granted LTV's motion except as to the amount of unamortized OID on the New Notes. *Id.*

LTV and Valley thereafter stipulated to $3,554,609 and $8,174,134 as the amount of unamortized OID on the Old Debentures and the New Notes, respectively, calculated in accordance with the bankruptcy court's opinion. After that stipulation, Judge Lifland on March 27, 1990 entered a judgment partially disallowing, in the above amounts, Valley's proofs of claim. The district court affirmed the bankruptcy court's decision in its entirety. *In re Chateaugay Corp.*, 130 B.R. 403, 405 (S.D.N.Y.1991).

## DISCUSSION

### I. *Original Issue Discount and Section 502(b)(2)*

#### A

Original issue discount results when a bond is issued for less than its face value. The discount, which compensates for a stated interest rate that the market deems too low, equals the difference between a bond's face amount (stated principal amount) and the proceeds, prior to issuance expenses, received by the issuer. OID is amortized, for accounting and tax purposes, over the life of the bond, with the face value generally paid back to the bondholders on the maturity date. If the debtor meets with financial trouble and turns to the bankruptcy court for protection, as in the present case, then OID comes into play as one of the factors determining the amount of the bondholder's allowable claim in bankruptcy.

Section 502 of the Bankruptcy Code, the framework for Chapter 11 claim allowance, provides that a claim shall be allowed "except to the extent that ... such claim is for unmatured interest." 11 U.S.C. § 502(b)(2) (1988). The first question we face is whether unamortized OID is "unmatured interest" within the meaning of section 502(b)(2). We conclude that it is. As a matter of economic definition, OID constitutes interest. *United States v. Midland–Ross Corp.*, 381 U.S. 54, 57, 85 S.Ct. 1308, 1310, 14 L.Ed.2d 214 (1965) (treating OID for tax purposes as income, not capital); *see also* Frank J. Slagle, Accounting for Interest: An Analysis of Original Issue

Discount in the Sale of Property, 32 S.D.L.Rev. 1, 21 n. 108 (1987) ("The amount of the discount represents compensation to the Lender for the use and forbearance of money, i.e., interest."). Moreover, the Bankruptcy Code's legislative history makes inescapable the conclusion that OID is interest within the meaning of section 502(b)(2). The House committee report on that section explains:

> Interest disallowed under this paragraph includes postpetition interest that is not yet due and payable, and any portion of prepaid interest that represents an original discounting of the claim, yet that would not have been earned on the date of bankruptcy. For example, a claim on a $1,000 note issued the day before bankruptcy would only be allowed to the extent of the cash actually advanced. If the original issue discount was 10% so that the cash advanced was only $900, then notwithstanding the face amount of [the] note, only $900 would be allowed. If $900 was advanced under the note some time before bankruptcy, the interest component of the note would have to be pro-rated and disallowed to the extent it was for interest after the commencement of the case.

H.Rep. No. 595, 95th Cong., 1st Sess. 352–53 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6308–09.

The courts that have considered the issue under section 502(b)(2) have held that unamortized OID is unmatured interest and therefore unallowable as part of a bankruptcy claim. *In re Public Service Co. of New Hampshire*, 114 B.R. 800, 803 (Bankr. D.N.H.1990); *In re Allegheny Int'l, Inc.*, 100 B.R. 247, 250 (Bankr.W.D.Pa.1989); *see also In re Pengo Indus., Inc.*, 129 B.R. 104, 108 (N.D.Tex.1991). *But cf. In re Radio–Keith–Orpheum Corp.*, 106 F.2d 22, 27 (2d Cir.1939) (under Bankruptcy Act, allowing debentures issued at a discount for full face amount), *cert. denied*, 308 U.S. 622, 60 S.Ct. 380, 84 L.Ed. 520 (1940). The *Public Service* court stated it plainly: "The word 'interest' in the statute is clearly sufficient to encompass the OID variation in the method of providing for and collecting what in economic fact is interest to be paid

to compensate for the delay and risk involved in the ultimate repayment of monies loaned." 114 B.R. at 803.

Applying this reasoning to the case at hand, we conclude, as did the bankruptcy and district courts, that OID on the Old Debentures, to the extent it was unamortized when the bankruptcy petition was filed, should be disallowed. We now turn to the main issue in dispute: the applicability of section 502(b)(2) to the New Notes, which were issued in a debt-for-debt exchange offer as part of a consensual workout.

### B

A debtor in financial trouble may seek to avoid bankruptcy through a consensual out-of-court workout. Such a recapitalization, when it involves publicly traded debt, often takes the form of a debt-for-debt exchange, whereby bondholders exchange their old bonds for new bonds. The debtor hopes that the exchange, by changing the terms of the debt, will enable the debtor to avoid default. The bondholders hope that by increasing the likelihood of payment on their bonds, the exchange will benefit them as well. The debtor and its creditors share an interest in achieving a successful restructuring of the debtor's financial obligations in order to avoid the uncertainties and daunting transaction costs of bankruptcy.

An exchange offer made by a financially troubled company can be either a "fair market value exchange" or a "face value exchange." *See* Marc S. Kirschner, et al., Prepackaged Bankruptcy Plans: The Deleveraging Tool of the '90s in the Wake of OID and Tax Concerns, 21 Seton Hall L.Rev. 643, 645–47 (1991); Allen L. Weingarten, Consensual Non–Bankruptcy Restructuring of Public Debt Securities, 23 Rev. of Sec. & Commodities Reg. 159, 161 (1990). In a fair market value exchange, an existing debt instrument is exchanged for a new one with a reduced principal amount, determined by the market value at which the existing instrument is trading. By offering a fair market value exchange,

an issuer seeks to reduce its overall debt obligations. Usually, this is sought only by companies in severe financial distress. A face value exchange, by contrast, involves the substitution of new indebtedness for an existing debenture, modifying terms or conditions but not reducing the principal amount of the debt. A relatively healthy company faced with liquidity problems may offer a face value exchange to obtain short-term relief while remaining fully liable for the original funds borrowed.

The question is whether a face value exchange generates new OID. The bankruptcy court, in an opinion endorsed by the district court, held that it does. The court reasoned that, by definition, OID arises whenever a bond is issued for less than its face amount, and that in LTV's debt-for-debt exchange, the issue price of the New Notes was the fair market value of the Old Debentures. The court therefore concluded that the New Notes were issued at a discount equaling the difference between their face value and the fair market value of the Old Debentures. *In re Chateaugay Corp.*, 109 B.R. at 56–57.

The bankruptcy court's reasoning leaves us unpersuaded. While its application of the definition of OID to exchange offers may seem irrefutable at first glance, we believe the bankruptcy court's logic ignores the importance of context, and does not make sense if one takes into account the strong bankruptcy policy in favor of the speedy, inexpensive, negotiated resolution of disputes, that is an out-of-court or common law composition. *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 220 (1977), *reprinted in* 1978 U.S.S.C.A.N. 5963, 6179–80; *see also In re Colonial Ford, Inc.*, 24 B.R. 1014, 1015–17 (Bankr.D.Utah 1982) ("Congress designed the Code, in large measure, to encourage workouts in the first instance, with refuge in bankruptcy as a last resort."). If unamortized OID is unallowable in bankruptcy, and if exchanging debt increases the amount of OID, then creditors will be disinclined to cooperate in a consensual workout that might otherwise have rescued a borrower from the precipice of bankruptcy. We must consider the ramifications of a rule that places a creditor in

the position of choosing whether to cooperate with a struggling debtor, when such cooperation might make the creditor's claims in the event of bankruptcy smaller than they would have been had the creditor refused to cooperate. The bankruptcy court's ruling places creditors in just such a position, and unreversed would likely result in fewer out-of-court debt exchanges and more Chapter 11 filings. Just as that ruling creates a disincentive for creditors to cooperate with a troubled debtor, it grants a corresponding windfall both to holdouts who refuse to cooperate and to an issuer that files for bankruptcy subsequent to a debt exchange. *See* John C. Coffee, Jr. & William A. Klein, Bondholder Coercion: The Problem of Constrained Choice in Debt Tender Offers and Recapitalizations, 58 U.Chi.L.Rev. 1207, 1248–49 & n. 121 (1991); Kirschner, et al., supra, 21 Seton Hall L.Rev. at 644–60.

The bankruptcy court's decision might make sense in the context of a fair market value exchange, where the corporation's overall debt obligations are reduced. In a face value exchange such as LTV's, however, it is unsupportable. LTV's liability to the holders of the New Notes was no less than its liability to them had been when they held the Old Debentures. The bankruptcy court, by finding that the exchange created new OID, reduced LTV's liabilities based on an exchange which, because it was a face value exchange, caused no such reduction on LTV's balance sheet.

We hold that a face value exchange of debt obligations in a consensual workout does not, for purposes of section 502(b)(2), generate new OID. Such an exchange does not change the character of the underlying debt, but reaffirms and modifies it. *Cf. In re Red Way Cartage Co.*, 84 B.R. 459, 461 (Bankr.E.D.Mich.1988) (in context of preferential transfers, settlement agreement did not create new debt, but only reaffirmed the antecedent debt); *In re Magic Circle Energy Corp.*, 64 B.R. 269, 273 (Bankr.W.D.Okla.1986) (same, explaining, "We do not accept the proposition that the consolidation of [debt] into a long-term promissory note wrought a metamorphosis

wherein the nature of the debt was altered."); *In re Busman*, 5 B.R. 332, 336 (Bankr.E.D.N.Y.1980) ("the rule [of § 502(b)(2) ] is clearly not entrenched as an absolute").

In the absence of unambiguous statutory guidance, we will not attribute to Congress an intent to place a stumbling block in front of debtors seeking to avoid bankruptcy with the cooperation of their creditors. Rather, given Congress's intent to encourage consensual workouts and the obvious desirability of minimizing bankruptcy filings, we conclude that for purposes of section 502(b)(2), no new OID is created in a face value debt-for-debt exchange in the context of a consensual workout. Thus, OID on the new debt consists only of the discount carried over from the old debt, that is, the unamortized OID remaining on the old debt at the time of the exchange.

The cases upon which the bankruptcy court relied in reaching a contrary conclusion are distinguishable. The court found support for its conclusion by looking to tax cases, because under the Internal Revenue Code, for purposes of determining taxable income, an exchange offer generates new OID. *See, e.g., Cities Service Co. v. United States*, 522 F.2d 1281, 1288 (2d Cir.1974) (holding in tax context that OID arose on exchange because the face amount of the issue exceeded the consideration), *cert. denied*, 423 U.S. 827, 96 S.Ct. 43, 46 L.Ed.2d 43 (1975). The tax treatment of a transaction, however, need not determine the bankruptcy treatment. *See, e.g., In re PCH Assocs.*, 55 B.R. 273 (Bankr.S.D.N.Y. 1985) (agreement structured as ground lease for tax benefits treated as joint venture under Bankruptcy Code), *aff'd*, 60 B.R. 870 (S.D.N.Y.), *aff'd*, 804 F.2d 193 (2d Cir.1986). The tax treatment of debt-for-debt exchanges derives from the tax laws' focus on realization events, and suggests that an exchange offer may represent a sensible time to tax the parties. The same reasoning simply does not apply in the bankruptcy context. *See* Kirschner, supra, 21 Seton Hall L.Rev. at 655–56.

Similarly distinguishable is *In re Allegheny Int'l, Inc.*, 100 B.R. 247 (Bankr.

W.D.Pa.1989), upon which the bankruptcy court relied heavily in determining that new OID was created by LTV's debt exchange. In *Allegheny*, the court considered and rejected the argument "that section 502(b)(2) does not apply ... to debentures created in the context of an exchange offer." *Id.* at 250. That case, however, involved a debt-for-equity exchange, not a debt-for-debt exchange. The debtor in *Allegheny* offered to exchange debt instruments for previously issued preferred stock. *Id.* at 248. Thus, the stockholders had no claim against the debtor prior to the exchange, and the debtor's balance sheet reflected an increase in overall liabilities from the exchange. We need not decide whether *Allegheny* was correct. Whether or not its reasoning is sound in the context of a debt-for-equity exchange, it is inapplicable to a debt-for-debt exchange such as LTV's.

## II. *Calculating OID Amortization*

◼ We now turn to the methodology for calculating OID amortization. Valley argues that the proper method for calculating unamortized OID under the Bankruptcy Code is the straight line method, by which the amount of the discount is spread equally over the duration of the maturation of the note. Under the straight line method, the same amount of interest accrues during each day of the instrument's term. LTV argues, in contrast, that the constant interest method—which also goes by the names yield-to-maturity, effective interest, or economic accrual—should be used. The constant interest method calculates OID amortization on the assumption that interest is compounded over time. Under the constant interest method, the amount of interest that accrues each day increases over time.

The bankruptcy court and district court opted for the constant interest method, and we agree. The constant interest method comports more closely than the straight line method with economic reality. *See* Slagle, supra, 32 S.D.L.Rev. at 24 (criticizing straight line method as a distortion on interest accrual).

One bankruptcy court has held that OID should be calculated by the straight line method for purposes of Bankruptcy Code section 502(b)(2), *Allegheny,* 100 B.R. at 254, but its reasoning is unconvincing. That court simply noted that the legislative history of section 502(b)(2) provides that unmatured interest should be "pro-rated," and assumed without analysis that the pro-rating must be done so that the increases are constant through time, rather than so that the *rate* of increase is constant through time. To say that interest must be pro-rated is only to restate the question, which is what method should be used for that pro-rating.

One further point must be addressed regarding the calculation of OID amortization. Our holding today that, for purposes of section 502(b)(2), no new OID is created by a face value debt-for-debt exchange in a consensual workout, means that the old OID is carried over to the new debt. In other words, when the Old Debentures were exchanged for the New Notes, the New Notes carried a discount equaling the amount of OID remaining on the Old Debentures after amortization by the constant interest method. The amount of OID remaining must then be amortized, again employing the constant interest method, over the life of the New Notes. Thus, a creditor's claim in bankruptcy may differ depending on whether the creditor participated in a workout; that difference, however, derives not from any new OID created by the exchange, but from the logical necessity of an amortization schedule that concludes on the maturity date. In the present case, because the New Notes carried an earlier maturity date than the Old Debentures, those bondholders who cooperated with the debtor find themselves with a slightly larger claim in bankruptcy, after the disallowance of unamortized OID, than those who did not.

Accordingly, the judgment of the district court is affirmed in part and reversed in part, and the matter remanded to the district court for remand to the bankruptcy court for further proceedings consistent with this opinion.