United States Court of Appeals,

Fifth Circuit.

No. 91–1769.

In the Matter of PENGO INDUSTRIES, INC., Pengo Finance, N.V., Debtors.

TEXAS COMMERCE BANK, N.A., Indenture Trustee, Appellee,

v.

Dr. Seymour LICHT, and Official Committee of Unsecured Creditors of Pengo Industries, Appellants.

June 12, 1992.

Appeals from the United States District Court for the Northern District of Texas.

Before GOLDBERG, DUHÉ, and BARKSDALE, Circuit Judges.

GOLDBERG, Circuit Judge:

A company finds itself unable to meet its debt obligations. Its bondholders fear bankruptcy, with its inherent delays, costs, and complications. But perhaps the company can work out its financial problems before capitulating to the bankruptcy courts. The company proposes an exchange: Bondholders can tender an old bond and receive a new bond of equal face value, but on terms more favorable to the company. The incentive for the bondholder is two-fold: an increased likelihood that the company can meet its obligations on the new bonds and the avoidance of bankruptcy proceedings. Although many bondholders do exchange their old bonds, the company nevertheless lands in bankruptcy court. The issue then becomes the amount of the new bondholder's claim against the debtor: Is it the full face value of the new bond or is it some lesser, discounted amount reflecting the fair market value of the old bond at the time of the exchange?

This particular query has fascinated not only creditors of companies engaging in consensual workouts, but also bankruptcy commentators and practitioners: Whether a face value exchange of debt instruments in a consensual out-of-court workout creates original issue discount that constitutes unallowable "unmatured interest" under section 502(b)(2) of the Bankruptcy Code. We affirm the

district court and hold that such an exchange does *not* generate "unmatured interest."

## I. BACKGROUND

The Pengo companies manufacture equipment for the petroleum industry, explosives, rubber products and earth-boring augers and teeth. In late 1988 and early 1989, involuntary petitions for relief under Chapter 11 of the Bankruptcy Code were filed against Pengo Industries, Inc. and its subsidiary, Pengo Finance, N.V. (collectively, "Pengo"). The Official Unsecured Creditors Committee and Dr. Seymour Licht, an individual creditor, objected to two proofs of claim filed by Texas Commerce Bank National Association ("TCBNA") on behalf of the holders of two securities, the Class A and Class B debentures. TCBNA served as indenture trustee for holders of Class A and Class B debentures.

Back in 1980, Pengo Finance issued $22,500,000 of 81/2% convertible debentures due in 1995. The public purchased these Old Debentures for the full face amount of $1,000 each. Neither Pengo Finance, nor Pengo, the guarantor, could make interest payments to the Old Debenture holders in 1983. Pengo merely accrued the interest expense on its books. Several years later, in 1985, a standstill agreement between Pengo and its senior secured lenders required an exchange offer as part of an out-of-court workout designed to enable Pengo to restructure its indebtedness. In the First Exchange Offer, Pengo Finance offered to exchange one 0% $500 face amount Class A debenture and one 0% $500 face amount Class B debenture for each 81/2% $1,000 face amount Old Debenture. Each participating Old Debenture holder received two New Debentures with a total face value of $1,000 for each of their Old Debentures with a face value of $1,000. The Old Debentures were subordinated to payment in full of the New Debentures. And, while the Old Debentures mature in 1995, the New Debentures matured in 1991. The Old Debentures could be redeemed for Pengo's common stock at a much less favorable rate than that for the New Debentures. About $13,205,000 of the Old Debentures—58.7% of the issue—were exchanged for the same face amount of New Debentures. Although holders of the New Debentures waived the payment of past due interest on

the Old Debentures, Pengo remained in default on the Old Debentures outstanding after the exchange because it continued to fail to make interest payments.

The reorganization plan placed all unsecured creditors into a single class, which included holders of both Old and New Debentures. Those creditors will share in a limited distribution. Since the total claims of the unsecured creditors exceed the amount of the limited distribution, the amount of the New Debenture holders' claims directly alters the funds available to all other unsecured creditors.

The two proofs of claim filed by TCBNA on behalf of the holders of Class A and Class B debentures in the Pengo bankruptcy represented the full face amount of the outstanding New Debentures. TCBNA did not deduct any amount for unamortized original issue discount. The Committee and Dr. Licht, who holds Old Debentures, objected to the amounts of the claims, arguing that the exchange created unamortized original issue discount and, thus, a portion of the claims constituted "unmatured interest" not allowable under 11 U.S.C. § 502(b)(2).[1]

After a hearing and upon stipulated facts, the bankruptcy court sustained the objections and reduced the New Debenture holders' two proofs of claim to eliminate what the court considered to be unamortized original issue discount—unmatured interest under section 502(b)(2). The district court reversed the bankruptcy court and held that the proofs of claim did not include a claim for original issue discount. *Texas Commerce Bank Nat'l Ass'n v. Licht (In re Pengo Indus., Inc.),* 129

---

[1]Section 502(b)(2) provides in relevant part that

> if such objection to a claim is made [under § 502(a) ], the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—(2) such claim is for unmatured interest.

11 U.S.C. § 502(b)(2) (Supp.1991).

B.R. 104 (N.D.Tex.1991).[2]  The Committee and Dr. Licht appeal from the judgment of the district court reversing the judgment of the bankruptcy court.  We review the bankruptcy court's conclusion of law *de novo.  Stoker v. Smith (In re Moody),* No. 91–2156, Slip op. 4091, 4092, —— F.2d ——, ——, —— (5th Cir. Apr. 29, 1992) (citing *Jordan v. Southeast Nat'l Bank (In re Jordan),* 927 F.2d 221, 224 (5th Cir.1991)).

## II. DISCUSSION

A. "Unmatured Interest" and Original Issue Discount.

Section 502(b) of the Bankruptcy Code requires the bankruptcy court to determine the amount of a claim objected to by a party in interest under section 502(a).  Congress has provided specific standards to guide the bankruptcy court in making this determination.  11 U.S.C. § 502(b)(1)–(8) (1979 & Supp.1991).  One established statutory rule is that the bankruptcy court must disallow any claim "for unmatured interest."  11 U.S.C. § 502(b)(2) (Supp.1991).  This rule flows from the legal principle that "interest stops accruing at the date of the filing of the petition."  S.Rep. No. 989, 95th Cong., 2d Sess. 63, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5849.

In this case, the bankruptcy rule meets an economic acronym:  OID.  OID—original issue discount—presents a definitional concept generally unfamiliar to those not bonded to the world of economics.  As ably explained by the Second Circuit, "[o]riginal issue discount results when a [debt instrument] is issued for less than its face value.  The discount, which compensates for a stated interest rate that the market deems too low, equals the difference between a [debt instrument]'s face amount (stated principal amount) and the proceeds, prior to issuance expenses, received by the issuer." *LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.),* No. 91–5098, —— F.2d ——, —— 1992 WL 71134, at *2 (2nd Cir. Apr. 13, 1992);  *see* Marc S. Kirschner, Dan A. Kusnetz, Laurence Y. Solarsh & Craig S. Gatarz, *Prepackaged Bankruptcy Plans:  The*

---

[2]The district court opinion contains all the stipulated facts.  For an exhaustive rendition of the events involved in this dispute, see *Pengo,* 129 B.R. at 105–08.

*Deleveraging Tool of the '90's in the Wake of OID and Tax Concerns,* 21 Seton Hall L.Rev. 643, 648–50 (1991) [hereinafter *Deleveraging Tool* ]; *see also* Nicholas P. Saggese, Gregg A. Noel & Michael E. Mohr, *A Practitioner's Guide to Exchange Offers and Consent Solicitations,* 24 Loy. L.A. L.Rev. 527, 548 n. 100 (1991) ("[A] debt security is issued with OID to the extent its stated redemption price at maturity exceeds its issue price.") [Hereinafter *Practitioner's Guide* ]. The discount on a debt instrument, deduced from a purchase price lower than the face value of the instrument, "is "in the nature of additional interest.' " *Deleveraging Tool, supra,* at 649 & n. 28 (citations omitted). The borrower amortizes the OID, "for accounting and tax purposes, over the life of the [debt instrument]," then the company pays back the face value to the holders on the maturity date. *Chateaugay,* —— F.2d at ——, 1991 WL 71134, at \*2.

The "unmatured interest" bankruptcy rule and the economic notion of "original issue discount" intersect to form the legal nexus for our decision-making. The term "unmatured interest," which is not defined by the Bankruptcy Code, encompasses OID. The economic reality of original issue discounting bolsters this conclusion. *Chateaugay,* —— F.2d at ——, 1992 WL 71134, at \*2 ("As a matter of economic definition, OID constitutes interest.") (citations omitted). For OID constitutes a "method of providing for and collecting what in economic fact is interest to be paid to compensate for the delay and risk involved in the ultimate repayment of monies loaned." *In re Public Serv. Co.,* 114 B.R. 800, 803 (Bankr.D.N.H.1990). Moreover, the legislative history verifies our inclusion of OID in the category of unallowable "unmatured interest." The Senate and House Reports both state that "[i]nterest disallowed under [§ 502(b)(2) ] includes postpetition interest that is not yet due and payable, and any portion of prepaid interest that represents an original discounting of the claim, yet that would not have been earned on the date of bankruptcy." S.Rep. No. 989, 95th Cong., 2d Sess. 62, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5848; H.R.Rep. No. 595, 95th Cong., 2d Sess. 352, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6308. Since Congress considered unamortized OID "the economic equivalent of "unmatured interest,' " we agree with both the bankruptcy court and the district court in concluding that any unamortized OID created in the Pengo exchange represents a

disallowable claim in bankruptcy under section 502(b)(2). *Deleveraging Tool, supra,* at 650; *see Chateaugay,* —— F.2d at ——, 1992 WL 71134, at *2 ("[C]ourts that have considered the issue under section 502(b)(2) have held that unamortized OID is unmatured interest and therefore unallowable as part of a bankruptcy claim.") (citations omitted).

B. The Debt-for-Debt Face Value Exchange.

The 1980's spawned trouble—trouble for companies encumbered by massive amounts of debt. Not surprisingly, this crisis has fused into "an explosion of debt defaults, out-of-court debt restructuring and bankruptcies." *Deleveraging Tool, supra,* at 643. A company confronted with debt default can choose to rearrange its finances out of court as an alternative to obtaining relief under the bankruptcy laws.

> A debtor in financial trouble may seek to avoid bankruptcy through a consensual out-of-court workout. Such a recapitalization, when it involves publicly traded debt, often takes the form of a debt-for-debt exchange, whereby bondholders exchange their old bonds for new bonds. The debtor hopes that the exchange, by changing the terms of the debt, will enable the debtor to avoid default. The bondholders hope that by increasing the likelihood of payment on their bonds, the exchange will benefit them as well. The debtor and its creditors share an interest in achieving a successful restructuring of the debtor's financial obligations in order to avoid the uncertainties and daunting transaction costs of bankruptcy.

*Chateaugay,* —— F.2d at ——, 1992 WL 71134, at *3. The Pengo exchange offer, like that in *Chateaugay,* constituted a "face value exchange," for Pengo simply substituted "new indebtedness for an existing debenture, modifying terms or conditions but not reducing the principal amount of the debt." *Id.; see Deleveraging Tool, supra,* at 646.[3] Pengo, as would any other offerer of a face value exchange, obtained "more time to recover from its financial problems," *Deleveraging Tool, supra,* at 646, but "remain[ed] fully liable for the original funds borrowed." *Chateaugay,* —— F.2d at ——, 1992 WL 71134, at *3.

---

[3]This case differs from *Chateaugay* in one respect. In *Chateaugay* the old debentures were originally issued at a discount. Because the original discount carried over from the old debt to the new debt, the Second Circuit found OID on the new debt, although no *new* OID was created by the face value debt-for-debt exchange. *Chateaugay,* —— F.2d at ——, 1992 WL 71134, at *6. Here, the Old Debentures were not issued at a discount; we confine our analysis to whether the exchange of the Old Debentures for the New Debentures generated OID.

The 1989 bankruptcy court decision of *In re Chateaugay* created an enormous disincentive for investors to participate in consensual out-of-court restructurings and, thus, spurred movement of financially troubled companies into the bankruptcy courts. *LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.),* 109 B.R. 51 (Bankr.S.D.N.Y.1990), *aff'd,* 130 B.R. 403 (S.D.N.Y.1991), *aff'd in part and rev'd in part,* No. 91–5098, ⎯⎯ F.2d ⎯⎯, 1992 WL 71134 (2nd Cir. Apr. 13, 1992). Before we explain why we choose not to follow the rule formulated by the *Chateaugay* bankruptcy court and urged by Appellants and, instead, adopt the rule of the *Chateaugay* court of appeals, we pause to further highlight the context of the *Chateaugay* and *Pengo* debt-for-debt face value exchange offers. The legislative history to section 502 supplies an example of how the pre-bankruptcy issuance of a note for cash generates OID: "[A] claim on a $1,000 note issued the day before bankruptcy would only be allowed to the extent of the cash actually advanced. If the original discount was 10 percent so that the cash advanced was only $900, then notwithstanding the face amount of note, only $900 would be allowed." S.Rep. No. 989, *reprinted in* 1978 U.S.C.C.A.N. at 5848; H.R.Rep. No. 595, *reprinted in* 1978 U.S.C.C.A.N. at 6308. In the illustration, the debtor issued a note *for cash,* while in *Chateaugay* and *Pengo* the debtor issued the debt instruments as part of an *exchange* of debt securities. *See Practitioner's Guide, supra,* at 550 n. 108. Although we conclude that the statutory rule excludes original issue discount to "prevent creditors from claiming *disguised, unearned interest*"—regardless of context—the legislative history simply does not provide guidance to courts considering section 502(b)(2) objections based on the notion of OID in the context of an exchange in a consensual out-of-court workout. *Id.* (emphasis in original); *see* Gary B. Wilcox & David M. Rievman, *Restructuring Troubled Debt Under the New Debt Exchange Rules,* 10 Va. Tax Rev. 665, 669 n. 28 (1991) [hereinafter *Restructuring* ].

The *Chateaugay* bankruptcy court, then, faced a narrow issue, but one of national first impression: Whether a face value exchange of debt instruments in a consensual out-of-court workout generated original issue discount not allowed under section 502(b)(2). In *Chateaugay* the LTV Corporation offered to exchange $1,000 face amount of new 15% senior notes and shares of common

stock for each $1,000 face amount of old 137/8% debentures. After the face value exchange in *Chateaugay,* LTV filed for Chapter 11 protection. The indenture trustees filed proofs of claim for the face value of the new notes. The bankruptcy court first held, as we do, that unamortized OID constituted "unmatured interest" under section 502(b)(2). *Chateaugay,* 109 B.R. at 55. The court also held, however, that the *exchange* represented the issuance of *new debt* because "[m]aturity dates, interest rates, and sinking fund requirements have all been changed in the New Notes." *Id.* at 56. According to the *Chateaugay* bankruptcy court, LTV issued the new notes at a discount gauged by the difference between the face amount of the new notes and the value paid for the new notes. The court reasoned that the fair market value of the "property given up in the exchange transaction"—the old debentures—constituted the proper measure of the issue price of the new notes.[4] *Id.* at 58 (holding that unamortized OID on the new notes could not be resolved on motion for summary judgment because dispute existed as to the value of the old debentures on the exchange date).

The Committee and Dr. Licht urge this Court to endorse the *Chateaugay* bankruptcy court's analysis and hold that the Pengo exchange created OID measured by the difference between the face amount of the New Debentures and the value given for the New Debentures, measured by the unamortized portion of the fair market value of the Old Debentures on the exchange date. The *Chateaugay* decision, however, produced a swift response from commentators who aggressively scrutinized its analysis of the original issue discount question in the face value exchange context and observed its effect on consensual out-of-court restructurings. *See Deleveraging Tool, supra,* at 647–48; Richard L. Epling, *Exchange Offers, Defaults, and Insolvency: A Short Primer,* Bankr.Devs.J. 15, 42–47 (1991) [hereinafter *Primer* ]; *Practitioner's Guide, supra,* at 548–51; *Restructuring,* supra, at 669 n. 28. This is so because the decision translated, in general terms, into the rule that when a financially troubled company exchanges new debt for old debt of equal face value, exchanging holders "will have a lower claim than those who did not [exchange], even though

---

[4]The court disregarded the value of the acquired stock in determining the value of the new notes; it compared the exchanged debentures with the acquired debt.

the overall debt obligation of the company has not been altered." *Deleveraging Tool, supra,* at 647. Under the rationale of the *Chateaugay* bankruptcy court, the claim of an exchanging holder of a debt instrument in a subsequent bankruptcy proceeding equals not the face amount of the new debt instrument, but the face amount of the new debt instrument *minus* the value paid for the new debt instrument, measured by the unamortized portion of the market value of the old debt instrument on the exchange date. For example, if we were to follow the *Chateaugay* bankruptcy court rule in this case, the claims of the exchanging holders of New Debentures would not be $1,000, the face amount of the New Debentures, but about $680, the face amount of the New Debentures ($1,000) minus the unamortized OID (approximately $320). This illustration makes it quite understandable that creditors of financially troubled companies are eager for the courts to provide them with guidance as to the post-bankruptcy ramifications of their workout decisions.

Until one month ago, the bankruptcy court's decision in *Chateaugay* represented the only school of judicial thought on the issue of whether a debt-for-debt face value exchange in a consensual out-of-court restructuring generated "unmatured interest" within the meaning of section 502(b)(2). But the *Chateaugay* bankruptcy and district court decisions did not reveal the complete interpretive scenario. A unanimous panel of the Second Circuit recently reversed the *Chateaugay* district court's judgment affirming the bankruptcy court and held, *inter alia,* that a face value exchange of debt obligations in a consensual workout does not generate OID. *Chateaugay,* —— F.2d at ——, 1992 WL 71134, at *5. This holding injected a new theory of OID into the bankruptcy jurisprudence. The legal landscape eloquently pictured by the Second Circuit persuades us that, like the LTV exchange, the debt-for-debt face value exchange in the Pengo consensual workout did not create original issue discount for purposes of section 502(b)(2). We discuss the factors that support our holding.

1. The Debt–for–Debt Face Value Exchange and Section 502(b)(2).

Bankruptcy policy strongly favors the "speedy, inexpensive, negotiated" adjustment of creditor-company relations afforded by out-of-court procedures. *Chateaugay,* —— F.2d at ——,

1992 WL 71134, at *4 (citing *In re Colonial Ford,* 24 B.R. 1014, 1015 (Bankr.D.Utah 1982)).  The Bankruptcy Code promotes out-of-court "workouts in the first instance, with refuge in bankruptcy as a last resort."  *Id.* (citing *Colonial Ford,* 24 B.R. at 1015).  *See generally Colonial Ford,* 24 B.R. at 1015–17 (extensively detailing the advantages of out-of-court workouts and explaining how the Code favors such restructurings).  We endorse the reasoning of the Second Circuit, which aims to align the resolution of the OID issue with this bankruptcy policy.  If the exchange of debt generates OID for the purposes of section 502(b)(2) and the unamortized portion of that OID is not allowed under section 502(b)(2), "then creditors will be disinclined to cooperate in a consensual workout that might otherwise have rescued a borrower from the precipice of bankruptcy."  *Id.*  A rule that a debt-for-debt face value exchange in a consensual out-of-court workout creates OID concomitantly reduces the likelihood that creditors will "cooperate with a struggling debtor" because such a rule lowers the exchanging creditors' claims in bankruptcy.  *Id.*  Creditors faced with the choice of either refusing to exchange or accepting the exchange offer would certainly realize that if they choose to exchange, their claim in a subsequent bankruptcy proceeding would shrink by the amount of unamortized OID.  *Primer, supra,* at 44 & n. 178 ("The financial press has noted this development with some dismay.").  This creditor awareness would surely translate into "fewer out-of-court debt exchanges and more Chapter 11 filings."  *Chateaugay,* —— F.2d at ——, 1992 WL 71134, at *4.

Such a rule also would "grant[ ] a ... windfall ... to holdouts who refuse to cooperate."  *Id.* (citation omitted).  The resulting dynamic is not difficult to prophesy.  As the exchanging creditors' claim to a piece of the distributional pie shrinks, the corresponding portion of the pie actually recovered by the holdouts grows.  *Practitioner's Guide, supra,* at 549–50 & n. 106.  Since a rule recognizing the creation of OID in the context of a debt-for-debt face value exchange not only penalizes the exchanging creditors by revaluing their claims downward, but also rewards the non-exchanging holdouts by increasing the chance of receiving the total amount of their fully-intact claims, it "gives creditors a *disincentive* to cooperate with a struggling debtor."  *Deleveraging Tool, supra,* at 658 (emphasis in original); *see Practitioner's Guide, supra,* at 549.  We strongly disfavor

a judicial interpretation of the Bankruptcy Code that contravenes the substantial Congressional policy favoring out-of-court consensual workouts. We hold, therefore, that the debt-for-debt face value exchange in the Pengo consensual out-of-court restructuring did not create "unmatured interest" in the form of original issue discount under section 502(b)(2) of the Bankruptcy Code.

2. Distinguishing Inapposite Scenarios.

As heretofore discussed, we decide only the narrow issue of whether a debt-for-debt face value exchange generates OID not allowed under section 502(b)(2). The parties offer cases and arguments discussing OID in contexts other than the one presented by the facts of this case. In closing, we think it is important to briefly state what this case is *not* about. First, we decline to consider when an *original* issue of debt might create a discount and, instead, appropriately confine our decision to whether the *exchange* of debt instruments in a consensual out-of-court restructuring creates a discount. *See supra* slip opinion page 4989 (contrasting how OID can arise when a debtor issues a debt instrument for an amount less than its face value with the suggestion that OID is generated when a debtor exchanges a debt instrument for another debt instrument of equal face value in a consensual out-of-court workout).

Next, we express no opinion as to whether a fair market value exchange creates OID not allowed under § 502(b)(2). In a "fair market value exchange," the holders exchange a debt instrument for a new debt instrument with a *lower* face amount. In the face value exchange involved in this workout, Pengo simply exchanged new indebtedness for old indebtedness with the same face amount.

We also refuse to investigate debt-for-stock exchanges and merely consider the debt-for-debt exchange presented by the facts of this case. In reducing the claims of the New Debenture holders, the bankruptcy court relied on *In re Allegheny Int'l, Inc.,* 100 B.R. 247 (Bankr.W.D.Pa.1989). That case, however, concerned a pre-bankruptcy debt-for-equity swap, not a debt-for-debt exchange. Allegheny offered to exchange new debentures for old preferred stock. *Id.* at 248. Since the equity

holders merely "had an *interest* in, but not a *claim* against" the debtor prior to the exchange, commentators have suggested that the exchange constituted an *original* issue of debt that created not only a claim against the debtor, but also a discount. *Deleveraging Tool, supra,* at 654 n. 43 (emphasis in original); *see Practitioner's Guide, supra,* at 549 n. 103 ("stockholder who exchanges his outstanding stock for debt has elevated his status to that of creditor"); *Primer, supra,* at 43 ("debentureholders had stepped up from an equity position as a result of the exchange"); *Restructuring, supra,* at 669 n. 28 ("preferred stockholders were elevated to creditor status"). We emphasize, as did the Second Circuit in *Chateaugay,* that we need not decide the distinct issue of whether OID arises from a debt-for-equity exchange. *Chateaugay,* ⸺ F.2d at ⸺, 1992 WL 71134, at \*5 (noting that debtor Allegheny's balance sheet reflected an increase in overall liabilities after the debt-for-equity exchange).

Finally, this is not a tax case. We stress that the tax treatment of original issue discounting does not control our inquiry, which is placed firmly within the bankruptcy framework. The Second Circuit firmly rebuked the *Chateaugay* bankruptcy court for its reliance on tax cases for the proposition that a debt-for-debt exchange offer in a consensual out-of-court restructuring generates OID. *Id.* ⸺ F.2d at ⸺, 1992 WL 71134 at \*5. While we might consider the tax treatment of a transaction persuasive authority in determining the bankruptcy treatment of that transaction, the tax rules applicable to a transaction certainly do not circumscribe those devised in bankruptcy. *Chateaugay,* ⸺ F.2d at ⸺, 1992 WL 71134, at \*5 (citations omitted); *Deleveraging Tool, supra,* at 655 & n. 46 (citations omitted). The bankruptcy system revolves around the policy that all creditors who are similarly situated are entitled to fair and equitable treatment. *Deleveraging Tool, supra,* at 655 & 660 n. 56. The tax system, however, usually requires that whenever a "realization event" has occurred and the taxpayer can measure the amount of realizable gain or loss, the taxpayer must include the consequences of that transaction in calculating the taxpayer's income. *Id.* at 656. Just because an exchange offer may constitute a realization event justifying the taxation of the participants, it does not follow that the transaction demands a corresponding transformation in the

relationship of similarly situated creditors.  *Chateaugay,* —— F.2d at ——, 1992 WL 71134, at *5;

*Deleveraging Tool, supra,* at 656.  As bluntly stated by the Second Circuit, the reasoning underlying

the tax treatment of debt-for-debt exchanges "simply does not apply in the bankruptcy context."[5]

*Chateaugay,* —— F.2d at ——, 1992 WL 71134, at *5.  Especially when polestar bankruptcy policy

militates against doing so, we do not feel compelled to interpret the Bankruptcy Code so as to parallel

the tax rules for a transaction.


## III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[5]The parties quarrel over whether this Court should consider certain statements contained in the Offering Circular about the reporting of interest income by holders of the New Debentures. We need not reach the issue of whether these statements are properly before this Court.  Even if we resolved that issue affirmatively, we repeat that the tax treatment of a transaction does not determine its treatment in bankruptcy.